Griggs, Appellant, *v.* Allegheny County, Appellant.

Argued September 29, 1960. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

412

re-argument refused February 15, 1961.

*William A. Blair,* with him *David B. Fawcett,* for plaintiff.

*Maurice Louik,* County Solicitor, with him *Francis A. Barry,* First Assistant County Solicitor, *John W. Mamula,* Second Assistant County Solicitor, and *Philip Baskin,* Special Counsel, for County, defendant.

OPINION BY MR. CHIEF JUSTICE JONES, January 16, 1961:

These appeals grow out of a viewers' proceeding instituted by the plaintiff as owner of land neighboring the Greater Pittsburgh Airport to recover damages from the County of Allegheny, the owner and operator of the airport, for an alleged appropriation of the plaintiff's land because of a substantial interference with the use and enjoyment of it caused by flights of aircraft at low altitudes, through the air space above the land, when taking off or landing at the airport.

The Greater Pittsburgh Airport was opened for commercial air travel on June 1, 1952. At that time, Thomas N. Griggs, the plaintiff, was the owner of a nearby tract of land containing 19.161 acres improved with a house, two cottages, a four-car garage with liv-

ing apartment overhead, and certain outbuildings. Part of the Griggs property lay under an "approach area" for the airport's northeast-southwest runway.

On May 29, 1958, Griggs petitioned the Court of Common Pleas of Allegheny County for the appointment of viewers to assess the damages caused by an alleged taking of his land by the County of Allegheny on June 1, 1952. The petitioner averred that, since the opening of the airport for commercial use, aircraft of several air lines, upon taking off and landing at the airport, have frequently and continuously flown through the air space above his land at an elevation of less than 500 feet; that as the result of such flights, "the use and enjoyment of [his] property have been interfered with by reason of the possible danger of the low flights, the noise and vibrations which they cause, their lights pointing at the premises at night time and interference with sleep and rest"; and that the property has been thereby "greatly damaged and depreciated in value."

The court appointed a board of view which sat for the purpose of its appointment, heard testimony offered by the claimant, and awarded him damages in the sum of $12,690. Griggs filed exceptions to the viewers' report alleging that the viewers had unlawfully disregarded the expect testimony adduced by him as to the damages to his property which was the only testimony offered before the viewers on that issue. He also appealed the award to the Court of Common Pleas of Allegheny County where the question of damages would be heard de novo. The county, contending that it was not liable for any damage allegedly suffered by the claimant, offered no testimony before the board of viewers on the issue of property value. The county filed exceptions to the viewers' award to Griggs setting forth therein that, based upon the viewers' findings of fact, there was no taking of Griggs' property *by the County.*

The court below dismissed all exceptions of both parties from which action each of the parties took an appeal to this court pursuant to Section 2623 of the Second Class County Code of July 28, 1953, P. L. 723, 16 PS §5623.

It is clear that a property owner may petition the court for the appointment of viewers to assess and award damages against an entity clothed with the power of eminent domain where such entity effects a "taking" of the petitioner's property whether or not the appropriator has followed the statutorily provided condemnation procedure. *Rosenblatt v. Pennsylvania Turnpike Commission,* 398 Pa. 111, 126-127, 157 A. 2d 182; *Philadelphia Parkway,* 250 Pa. 257, 264-265, 95 Atl. 429; *Barron's Use v. United Railway Co.,* 93 Pa. Superior Ct. 555, 557-558. A "taking" occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property. *Miller v. Beaver Falls,* 368 Pa. 189, 196-197, 82 A. 2d 34; *Creasy v. Stevens,* 160 F. Supp. 404, 410-412.

Paragraph 12 of Griggs' petition for the appointment of viewers admits that the county has not condemned his land by way of the statutorily authorized procedure.[1]

What the claimant attempted to show at the hearing before the viewers was that the county had substantially deprived him of the beneficial use and enjoyment of his property. Assuming, for present purposes, that he has shown a substantial deprivation of the beneficial use and enjoyment of his property, we shall proceed at once to a consideration of the basic question

---

[1] Section 14 of the Airport Zoning Act of April 17, 1945, P. L. 237, 2 PS §1563, confers upon political subdivisions the power to condemn air avigation easements and other estates in property for the purpose of providing approach protection for aircraft.

raised by the county's appeal as to whether such deprivation was, as a matter of law, caused by the County of Allegheny.

The county, relying on findings of fact by the viewers that no flights of aircraft were shown to be in violation of any regulation of the Civil Aeronautics Administration and that no flights were shown to be lower than necessary for a safe landing or take-off, contends that all of the complained of flights were through air space which the United States Congress placed within the public domain and that, therefore, any taking of Griggs' property was by the federal government and not by the County of Allegheny.

Section 10 of the Air Commerce Act of May 20, 1926, 44 Stat. 568, as amended, 49 U.S.C.A., §180, provides as follows: "As used in this Act, the term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority, and such navigable airspace shall be subject to a public right of freedom of interstate and foreign air navigation in conformity with the requirements of said sections."

Section 3 of the Civil Aeronautics Act of June 23, 1938, 52 Stat. 973, 49 U.S.C.A., §403, states that "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the *navigable air space* of the United States." (Emphasis supplied)

Section 1 (24) of the Act, 49 U.S.C.A., §401(24), defines "navigable air space" as follows: " 'Navigable air space' means air space above the minimum altitudes of flight prescribed by regulations issued under this Act."

Pursuant to authority granted by the Civil Aeronautics Act of 1938, the Civil Aeronautics Board issued Civil Air Regulations (14 C.F.R., Parts 1-190).

Among these Regulations, Section 60.17, Part 60 (Air Traffic Rules), which establishes minimum safe altitudes of flight at 1000 feet over congested areas and 500 feet over other than congested areas, is prefaced with the following: "Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes:". The County of Allegheny contends that this exception means that minimum safe altitudes of flight for take-offs and landings have been established at the heights necessary for these purposes.[2] The county concludes, therefore, that the "navigable air space" which Congress placed within the public domain includes all air space needed by an airplane for take-off or landing.

While the conclusion has the rationale of reality to support it, we are precluded from adopting it by the Supreme Court's interpretation of similar regulations in *United States v. Causby,* 328 U. S. 256 (1946). The decision in that case upheld the claimant's right to damages from the United States for a taking of certain of his property located near an airport because of a substantial interference with his use and enjoyment of it by low flights of U. S. military planes, when taking off from or landing at the airport. In answer to an argument similar to that which the County of Allegheny makes here, the Supreme Court said (at pp. 263-264), "The fact that the path of glide taken by the planes was approved by the Civil Aeronautics Authority does not change the result. The navigable airspace which Congress has placed in the public domain is 'airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority.' 49 U.S.C., sec. 180. If that agency prescribed 83 feet [the height at which the planes passed over Causby's

---

[2] This is now the position of the Civil Aeronautics Board. Civil Air Regulations, Interpretation 1, 19 F.R. 4602, July 27, 1954.

land] as the minimum safe altitude, then we would have presented the question of the validity of the regulation. But nothing of the sort has been done. The path of glide governs the method of operating—of landing or taking off. The altitude required for that operation is not the minimum safe altitude of flight which is the downward reach of the navigable airspace. The minimum prescribed by the Authority is 500 feet during the day and 1,000 feet at night for air carriers (Civil Air Regulations, Pt. 61, sections 61.7400, 61.7401, Code Fed. Reg. Cum. Supp., Tit. 14, ch. 1), and from 300 feet to 1,000 feet for other aircraft, depending on the type of plane and the character of the terrain. Id. Pt. 60, sections 60.350-60.3505, Fed. Reg. Cum. Supp., supra. Hence, the flights in question were not within the navigable airspace which Congress placed within the public domain. If any airspace needed for landing or taking off were included, flights which were so close to the land as to render it uninhabitable would be immune. But the United States concedes, as we have said, that in that event there would be a taking. Thus, it is apparent that the path of glide is not the minimum safe altitude of flight within the meaning of the statute. The Civil Aeronautics Authority has, of course, the power to prescribe air traffic rules. But Congress has defined navigable airspace only in terms of one of them—the minimum safe altitudes of flight."[3]

Thus, the Supreme Court has held that the navigable air space which Congress placed in the public domain does not include the path of glide for an airplane's take-off or landing. As we are, of course, bound by the Supreme Court's interpretation of the federal

---

[3] The Supreme Court of Washington recently rejected the identical argument, based upon Section 60.17, Part 60, of the Civil Air Regulations, that the County of Allegheny is now pressing upon us, quoting this paragraph from *United States v. Causby*, supra. *Ackerman v. Port of Seattle*, 348 P. 2d 664 (1960).

statutes involved, we are, perforce, required to reject the County's contention that navigable air space, as employed by Congress, includes the area necessary for an airplane's take-off or landing in safety.[4]

But, even though the complained of flights were not through air space which was part of the public domain, the record does not show that the County of Allegheny was the efficient legal cause of any damage resulting from the flights. Griggs testified at the hearing before the viewers that the airplanes of several commercial air lines flew over his land at low altitudes. But, he offered no proof that any of these planes were owned by the County of Allegheny or operated by its agents. Indeed, the viewers found as a fact that "There is no evidence of any control exercised over any aircraft by the County of Allegheny." That finding, supported as it is by the record, precludes the claimant from recovering against the County in this proceeding.

In unwarrantedly awarding damages to Griggs, the viewers relied upon a finding of fact that the County, in compliance with rules and regulations of the Civil Aeronautics Authority, drafted a "Master Plan," showing an "approach area" over part of Griggs' property, which plan was submitted to and approved by the Civil

---

[4] Congress moved to counteract the effect of the decision in *United States v. Causby*, supra, by enacting the Federal Aviation Act of August 23, 1958, Pub. L. 85-726, 72 Stat. 731, 49 U.S.C.A., §1301 et seq., Section 1401(b) whereof repealed the Civil Aeronautics Act of 1938. Section 104 of the later Act, 49 U. S. C. A., §1304, provides that, "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace of the United States." And, Section 101 (24), 49 U.S.C.A., §1301(24), declares that (as used in the Act), "'Navigable airspace' means airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, *and shall include airspace needed to insure safety in take-off and landing of aircraft*." (Emphasis supplied.)

Aeronautics Authority. But the drafting, submission, and approval of the plan did not give the County an easement of avigation over Griggs' property, nor was any evidence offered to show that such action deprived Griggs of any use and enjoyment of his property, substantially or otherwise.

It is true that in *United States v. Causby,* supra, the United States was held to have effected a taking of certain property neighboring an airport. But there the United States owned and its agents operated the aircraft which caused the deprivation of the owner's use and enjoyment of the neighboring property. The airport itself was owned by the Greensboro-High Point Municipal Authority, which had leased to the United States Government the right to use the field "concurrently, jointly, and in common" with other users. The Supreme Court in the *Causby* opinion did not indicate who actually maintained and operated the airport, evidently considering this point irrelevant.

For Griggs to make use of *United States v. Causby,* supra, as a precedent, it would seem that he should look for relief to the owners or operators of the aircraft which have made the complained of flights through the air space above his land. Such relief is contemplated by Section 403 of the Aeronautical Code of May 25, 1933, P. L. 1001, 2 P.S. §1469, which provides, in part, as follows: "The owner and the pilot, or either of them, of every aircraft which is operated over the lands or waters of this Commonwealth, shall be liable for injuries or damage to persons or property on or over the land or water beneath, caused by the ascent, descent, or flight of aircraft, or the dropping or falling of any object therefrom, in accordance with the rules of law applicable to torts on land in this Commonwealth."

Commercial air lines are not, of course, clothed with the power of eminent domain and cannot, therefore, be

proceeded against by a complaining land owner through a viewers' proceeding for the assessment of damages for a taking of his property.

In view of our conclusion herein that there has been no taking of the plaintiff's property by the County of Allegheny in the particulars complained of, and that, consequently, the County is not liable to the plaintiff for any deprivation of the use and enjoyment of his property by airplanes utilizing the Greater Pittsburgh Airport, the question raised by the plaintiff's appeal has become moot.

The order dismissing the County's exceptions to the viewers' report on appeal at No. 155 is reversed with directions that the viewers' report be vacated and set aside.

Plaintiff's appeal at No. 158 is dismissed.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

In *Gardner v. Allegheny County*, 382 Pa. 88, 114 A. 2d 491, the Court analyzed and reviewed at length a number of the problems arising out of flight of aircraft over privately owned lands and held inter alia (page 116) : first, "It is clear as crystal under the authority of United States v. Causby [328 U.S. 256] that flights over private land which are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land amount to a 'taking'." And secondly, that a Court of Equity has no power or jurisdiction to assess damages for a taking, but damages for property taken, injured or destroyed lies in proceedings before the Board of View. In that decision we did not decide who were proper defendants. The plaintiff, relying on the *Gardner* case, brought proceedings before the Board of View and proved that the flights were so low and so frequent as to be a direct

and immediate interference with the enjoyment and use of his land and hence amounted to a taking for which he was entitled to recover damages in eminent domain proceedings before the Board of View.

The Viewers found, inter alia, that "The 'taking' of the superterranean easement over the property of Griggs became effective on June 1, 1952, at 1201 A.M., by virtue of the Resolution of the Commissioners of Allegheny County dated May 27, 1952, designating that date and hour as the time for the opening of the Greater Pittsburgh Airport for public user. Consequently, the right to damages accrued at that time.

"The damages allowed by the Viewers have been measured by the usual procedure of deducting the after value from the value of the property as a whole immediately before and unaffected by the public improvement, to which has been added 6% per annum interest as detention money from the date of opening the Airport. We have found that the highest and best use of the property was as a country estate. We determine the 'after' diminished value of the property as being directly and immediately caused by frequent low flying to and from the Airport, inevitably producing noise, vibration, fear of disaster, anxiety and general interference with the peaceful and quiet enjoyment of the property by the owner, resulting in damages to the extent of $12,690."

Defendant appealed because it believed it had no liability. Plaintiff appealed because he believed the award of damages was inadequate. The two basic questions involved are (1) whether the County of Allegheny had any liability for the damages which plaintiff unquestionably suffered and (2) if so, what was the date of the taking and subsidiarily were the damages inadequate?

The County of Allegheny acquired the Greater Pittsburgh Airport and all the land included in and/or

surrounding the airport, as well as air rights and/or easements by eminent domain, pursuant to the Act of May 2, 1929, P. L. 1278. The Airport was opened for commercial flights on July 1, 1952. The County not only owned the Airport, but it also constructed the buildings thereon and the landing fields and the runways to the airport. It also owed a duty to repair and maintain them. It leased the land and facilities for commercial flights to various airlines. Furthermore, the County knew that the approach and the path of glide or the descent path and the airlines themselves were in minute detail regulated, prescribed and directed how, when and where to fly, how, when and where to approach, and land and take off, by independent Governmental Agencies known as the Federal Aviation Agency and the Civil Aeronautics Board.

Regular and almost continuous daily flights, often several minutes apart, have been made by a number of airlines directly over and very, very close to plaintiff's residence. During these flights it was often impossible for people in the house to converse or to talk on the telephone. The plaintiff and the members of his household (depending on the flight which in turn sometimes depended on the wind) were frequently unable to sleep even with ear plugs and sleeping pills; they would frequently be awakened by the flight and the noise of the planes; the windows of their home would frequently rattle and at times plaster fell down from the walls and ceilings; their health was affected and impaired, and they sometimes were compelled to sleep elsewhere. Moreover, their house was so close to the runways or path of glide that as the spokesman for the members of the Airlines Pilot Association admitted "If we had engine failure we would have no course but to plow into your house." Moreover, the flights were endangered by plaintiff's trees and vice versa. The Viewers found, inter alia, that at the

Griggs' property the surface of the approach area is only 11.86 feet above plaintiff's residence. There isn't the remotest doubt and the Viewers so found that these low flights produced exceptional noise, disturbance and vibrations, placed the plaintiff and the members of his household in fear and jeopardy of their safety or lives and substantially, materially and realistically interfered with the peaceful, quiet and legally justifiable enjoyment of their property.

There are four possible solutions: (1) No recovery —damnum absque injuria, like cases where property owners along a railroad track cannot recover for the noise and smoke which inconveniences and upsets them. (2) The United States is liable because (a) it furnished funds to the County of Allegheny to help pay for the acquisition and construction of this airport, and (b) it approved by a contract the County's acquisition of and its master plan for this airport, and (c) it regulates and minutely orders and directs through the Civil Aeronautics Board the take-offs and landings and path of glide of all planes entering and leaving the airport. (3) The airlines which fly some or many of the flights which injure plaintiff's property and interfere with or jeopardize its existence and the safety of plaintiff and others lawfully thereon. (4) The County of Allegheny which acquired by eminent domain the ownership of the property and constructed the airport, the buildings, the approaches and runways, all of which it must maintain at its expense, leases and (to some extent) operates the airport. It clearly failed to acquire by eminent domain or otherwise sufficient land and air rights to protect plaintiff's property and his safety and life, and the safety and lives of his family.

It would be not only unfair but also unconstitutional to deny plaintiffs any recovery for the taking of either their land or an easement thereon. Article XVI, §8 of the Constitution of Pennsylvania provides:

"Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation *for property taken, injured*\* or destroyed by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured before such taking, injury or destruction." The Constitution of the United States, Article V, similarly provides: ". . . nor shall private property be taken for public use, without just compensation."

We agree that the evidence clearly shows that there was a "taking" of plaintiff's superterranean easement, and I am convinced that the evidence demonstrates that there was a "taking" of plaintiff's entire property.

In *Miller v. Beaver Falls,* 368 Pa. 189, 82 A. 2d 34, the Court said (pages 196-197) : ". . . 'The law as to what constitutes a taking has been undergoing a radical change during the last few years. Formerly it was limited to the actual physical appropriation of the property or a divesting of title, but now the rule adopted in many jurisdictions and supported by the better reasoning is that *when a person is deprived of any of certain rights in and appurtenant to tangible things, he is to that extent deprived of his property,* and his property may be taken, in the constitutional sense, though his title and possession remain undisturbed . . . "and it may be laid down as a general proposition, based upon the nature of property itself, that, *whenever the lawful rights of an individual to the possession, use or enjoyment of his land are in any degree abridged or destroyed by reason of the exercise of the power of eminent domain, his property is, pro tanto, taken, and he is entitled to compensation*"' [Cheves v. Whitehead, 1 F. Supp. 321] : 11 McQuillin, Municipal Corporations (3rd ed.) §32.26, p. 312. As

---

\* Italics throughout, ours.

the Court of Appeals of New York, in Forster v. Scott, 136 N.Y. 577, 32 N.E. 976, . . . so aptly said (page 584) : '. . . All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. . . .'

". . . [As] Mr. Justice, later Chief Justice SCHAFFER, in his opinion, after calling attention to the provisions of the Constitution of Pennsylvania, said (page 490) : 'The governing principle is accurately stated in 20 Corpus Juris, 566, "There need not be an actual, physical taking, but any destruction, restriction or interruption of the common and necessary use and enjoyment of property in a lawful manner may constitute a taking for which compensation must be made to the owner of the property." ' "

Airplanes and airports are of modern origin. The problems which have arisen in connection with airports and aircraft and air travel were unknown to the Common Law and in reality arose for the first time in the 1920's, or thereafter. Until the opening of the air age the owner of real property owned from the surface (or below) to the sky—cujus est solum ejus est usque ad coelum. That principle has been very substantially modified. It is now held that the owner of land owns from the surface (or lower regions) to the upper reaches and regions of the air to whatever heights may be needed for use and the enjoyment of his property. In considering the problems created by the air age, we are faced with the task of reconciling traditional common law concepts with the realities of modern day life. In our desire for progress we must not overlook or extinguish the inherent and inalienable constitutionally guaranteed rights of private property which is one of the bedrocks of our Federal and State Governments, and indeed one of the two great hallmarks of western civilization. We must not allow, in the

appealing name of progress or general welfare, a property owner to be deprived by the Federal, State or County Government, or by anyone, of his property or any rights accruing therein and therefrom.

As Mr. Justice HOLMES said in his opinion in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415-416, 43 S. Ct. 158 (in which he declared the Kohler Act of May 27, 1921, P.L. 1198 unconstitutional): "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. Hairston v. Danville & Western Ry. Co., 208 U.S. 598, 605. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

"The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change . . ."

The contention that the County is exempt from liability (a) because the air space is a few feet above plaintiff's property and within the public domain, and (b) whatever injury or damage was caused was caused by the airlines, and (c) because the appropriate Federal Agency authorized the flights, is without merit. The United States Supreme Court in *United States v. Causby*, 328 U.S. 256, has rejected these contentions. There, the Court, speaking through Mr. Justice DOUGLAS, pertinently said (pages 263-265): "The fact

that the path of glide taken by the planes was that approved by the Civil Aeronautics Authority does not change the result. The navigable airspace which Congress has placed in the public domain is 'airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority.' 49 U.S.C. §180. If that agency prescribed 83 feet as the minimum safe altitude, then we would have presented the question of the validity of the regulation. But nothing of the sort has been done. *The path of glide governs the method* of operating—*of landing or taking* off. *The altitude required for that operation is not the minimum safe altitude of flight which is the downward reach of the navigable airspace.* The minimum prescribed by the Authority is 500 feet during the day and 1,000 feet at night for air carriers (Civil Air Regulations, Pt. 61, §§61.7400, 61.7401, Code Fed. Reg. Cum. Supp., Tit. 14, ch. 1), and from 300 feet to 1,000 feet for other aircraft, depending on the type of plane and the character of the terrain. Id., Pt. 60, §§60.350-60.3505, Fed. Reg. Cum. Supp., supra. Hence, the flights in question were not within the navigable airspace which Congress placed within the public domain. If any airspace needed for landing or taking off were included, flights which were so close to the land as to render it uninhabitable would be immune. But the United States concedes, as we have said, that *in that event there would be a taking. Thus, it is apparent that the path of glide is not the minimum safe altitude of flight within the meaning of the statute.* The Civil Aeronautics Authority has, of course, the power to prescribe air traffic rules. But Congress has defined navigable airspace only in terms of one of them—the minimum safe altitudes of flight.

"We have said that the airspace is a public highway. Yet it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive

control of the immediate reaches of the enveloping atmosphere. Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run. The principle is recognized when the law gives a remedy in case overhanging structures are erected on adjoining land. The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. See Hinman v. Pacific Air Transport, 84 F. 2d 755. The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material. As we have said, *the flight of airplanes, which skim the surface but do not touch it, is as much an appropriation of the use of the land as a more conventional entry upon it.* We would not doubt that, *if the United States erected an elevated railway over respondents' land at the precise altitude where its planes now fly, there would be a partial taking, even though none of the supports of the structure rested on the land.* The reason is that there would be an intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it. While the owner does not in any physical manner occupy that stratum of airspace or make use of it in the conventional sense, he does use it in somewhat the same sense that space left between buildings for the purpose of light and air is used. *The superadjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. We think that the landowner, as an incident to his ownership, has a claim to it and that invasions of it are in the same category as invasions of the surface."**

---

* Under facts on all fours with the facts in the instant case, our sister states have held that an injunction will issue against a city or county which owns or operates an airport, on the ground

Moreover, an airport is like a bridge; the County must provide, furnish and maintain suitable approaches and the owner of the airport or bridge must take sufficient land, and in cases of airports, air approaches, easements and air rights so that it will be safe for its users. Cf. *Penn Township v. Perry County,* 78 Pa. 457; *Knoll v. Harborcreek Township,* 86 Pa. Superior Ct. 423; *Beaver Borough v. Beaver Valley Railroad Company,* 217 Pa. 280, 66 A. 520; *Miller v. Beaver Falls,* supra; *United States v. Causby,* 328 U.S. 256; *Ackerman v. Port of Seattle,* 329 P. 2d 210, 348 P. 2d 664.

Even if it be conceded arguendo that the air space in question, namely, 12 feet above plaintiff's home and buildings, is a part of the public domain, it could not, *under the Constitution* and under *United States v. Causby,* be taken for public use without proper compensation. Not only is it unsafe for the planes, but it seriously jeopardizes the health and safety of plaintiff and his family and guests and constitutes not only an unreasonable interference with his property, but also amounts to a nuisance.

The majority opinion clearly implies that the injury or taking was by the Airlines. While this is irrelevant in the present case since the Airlines are not parties hereto, I believe that under the facts herein this position is legally unsound and realistically impossible. None of the companies which fly the airlines nor the pilots are clothed with the power of eminent domain. They follow implicitly the law, the regulations and the orders of the Government of the United States or one of its agencies. They are, figuratively speaking,

that flights which jeopardize the health, safety or property of a landowner amount to a nuisance: *City of Phoenix v. Harlan,* 75 Ariz. 290, 255 P. 2d 609; *Brooks v. Patterson,* 159 Fla. 263, 31 So. 2d 472; *Delta Air Corporation v. Kersey,* 193 Ga. 862, 20 S.E. 2d 245.

impotent slaves of the Federal Aviation Agency on their flights, their take-offs, their paths of glide and descent paths, and their landings. Moreover, it would be realistically impossible for a property owner to prove which Airlines damaged his property and to what extent each damaged his property. It would require a property owner to sit day and night outside his home or building for weeks or months to determine which Airline did what, and to allocate the damage and the blame, and exactly what moment of the day, week, month or year it occurred. Moreover, if he or a member of his family or employee were sitting and watching outside his home, how could he or they know, even with an interspace telephone, exactly what was happening at a particular moment to the owner's wife or those inside his home, and exactly what was happening at that particular moment to the walls, ceilings, plaster and interior of his house, and which Airline caused what?

There is likewise no merit in the County's last two contentions. The fact that the Civil Aeronautics Board or other Federal Authority approved the flights in question is irrelevant and immaterial in the present case, although it may be relevant in cases where the facts are substantially different. Although we believe that the airspace in question, i.e., 12 feet above plaintiff's home, is not a part of the public domain—Federal, State, local or otherwise—even if it were, its appropriation and use for planes flying into and out of this airport at that height would amount to a "taking" of plaintiff's property. *United States v. Causby* and cases supra.

In *Ackerman v. Port of Seattle,* supra, the Supreme Court of Washington decided that the Airport owned by the Port of Seattle was liable in damages for a "taking" which resulted from low flights into the Airport in accordance with Federally prescribed regu-

lations or orders. Washington has the same Constitutional provision as does the Commonwealth of Pennsylvania in regard to compensation for private property taken, injured or destroyed. That Court held specifically that flights in the normal approach area which caused fear, anxiety and apprehension constituted an unreasonable interference with plaintiff's property and amounted to a "taking" by the Port of Seattle. In the course of its opinions that Court aptly said (329 P. 2d, page 216, 221 and 348 P. 2d, page 671): ". . . if the state first declared certain private lands to be public domain and then built a road thereon, it is quite apparent that there would be a violation of Art. I, §16, amendment 9, of the Washington constitution. We believe this is as true with space in the air as it is with the surface of land. The government simply cannot arbitrarily declare that all of the airspace over a person's land is public domain and then, cavalierly, claim absolute immunity against property owners' claims for any and all possible damages. . . .

" '. . . under this constitutional provision, a recovery may be had in all cases where private property has sustained a substantial damage by the making and using an improvement that is public in its character; that it does not require that the damage shall be caused by a trespass, or an actual physical invasion of the owner's real estate, . . .'

"This interpretation of Congress' declaration as to what constitutes public domain in the airspace is supported by the Federal government's policy of condemning and compensating for air easements over property adjoining Federal air bases. See United States v. 48.10 Acres of Land, etc., D.C.S.D.N.Y. 1956, 144 F. Supp. 258.* . . . Clearly, *an adequate approach*

---

* The City of Philadelphia similarly acquires by purchase or otherwise air rights over properties adjacent to its International

*way* is as necesary a part of an airport as is the ground on which the airstrip, itself, is constructed, if the private airspace of adjacent landowners is not to be invaded by airplanes using the airport. The taking of an approach way is thus reasonably necessary to the maintenance and operation of the airstrip."

Finally, the fact that the Civil Aeronautics Board approved the plan for the airport will not relieve the County which is the owner of the airport and the adjoining land. If there could be any doubt as to the County's liability it would unquestionably be removed by (1) well settled principles of law and (2) by *United States v. Causby*, supra, and (3) by the agreement entered into between the United States and the County by which the County obtained enormous federal aid for the construction of this airport. In that agreement the County specifically undertook, inter alia, the following: "(i) Insofar as is within its powers and reasonably possible, *the Sponsor will prevent the use of any land either within or outside the boundaries of the Airport in any manner* (including the construction, erection, alteration, or growth of any structure or other object thereon) *which would create a hazard to the landing, take-off or maneuvering of aircraft at the Airport, or otherwise limit the usefulness of the Airport. This objective will be accomplished* either by the adoption and enforcement of a Zoning Ordinance and regulations, *or by the acquisition of easements or other interests in land or airspace,* or by both such methods."

The duty and legal obligation to acquire land, buildings, easements and other interests in land and in air space which, unless acquired, would create a hazard to the landing, take-off, paths of glide, descent paths

Airport in order to comply with the Constitution of Pennsylvania and the Constitution of the United States.

and authorized flights of aircraft, or otherwise limit the safety, usefulness and adequacy of the Airport, was clearly and unquestionably *by the terms of this contract* that of the County of Allegheny. It follows that the County is liable to the plaintiff (1) under and by virtue of the well and long settled Common Law principle of sic utere tuo ut alienum non laedas, and (2) under the *United States v. Causby* case, and (3) by reason of the aforesaid contract which the County made and entered into with the United States of America.*

The Viewers determined the taking of plaintiff's property as of the opening of the Airport June 1, 1952, pursuant to a prior County ordinance. The great difficulty which arises because of the complexity of the facts in this case is instantly apparent, and it is virtually a practical impossibility to fix any other date for the taking. We cannot say that the date which the Viewers found constituted a taking was erroneous. Moreover, in view of the conflicting testimony and the inherent difficulty of appraising and fixing the damage which plaintiffs suffered, we cannot say that the Viewers erred in their verdict.

I would affirm the Orders of the lower Court.

Mr. Justice EAGEN joins in this dissenting opinion.

---

* Per the Administrator of Civil Aeronautics.