Redevelopment Authority of the City of Oil City, Appellant *v.* Jane T. Woodring, Appellee.

Argued May 5, 1981, before President Judge CRUMLISH and Judges MENCER, BLATT, CRAIG and MAC-PHAIL. Judges ROGERS, WILLIAMS, JR. and PALLADINO did not participate.

*John D. Rynd, Jr., Rynd and Olmes,* for appellant.

*Benjamin G. McFate, McFate, McFate, McFate, Williams & McFate,* for appellee.

OPINION BY JUDGE BLATT, June 29, 1981:

The appellant, the Redevelopment Authority of the City of Oil City (Authority) seeks review of a decision of the Court of Common Pleas of Venango County which found that certain actions by the Authority constituted a de facto taking of the property of the appellee, Jane T. Woodring. A board of view was appointed to determine the amount of compensation to which she was entitled.

In April of 1974, the Authority approved and adopted a redevelopment plan for the central business district of the City of Oil City, which provided, *inter alia,* that all above-ground utility lines in the area were to be placed underground. The Authority and the Pennsylvania Electric Company, the utility which supplies electricity to the citizens and businesses in Oil City, entered into a contract by which the utility agreed to remove existing overhead equipment and to install underground service at its own cost. The Authority also agreed to request the cooperation of the utility's customers in meeting the costs of the changeover as required by the utility's tariff.[1] The said tariff provides that customers shall assume the expense of changing the location of the delivery point for electricity on their premises if such a change is necessary when a utility is required to place its lines underground.

---

[1] The tariff of the Pennsylvania Electric Company is a compilation of the rates, rules and regulations of the utility, as approved by the Pennsylvania Public Utility Commission, governing the relative rights and duties of the utility and its customers.

In applying for the appointment of viewers, the appellee alleged that the action of the Authority caused her to expend substantial sums in order to ensure the continuation of electrical service to her premises and that such action amounted to a de facto taking by the Authority. The court below agreed and appointed a board of view to determine the amount of compensation due.[2] This appeal followed.

A de facto condemnation of property takes place when an entity exercises the power of eminent domain and the immediate, necessary and unavoidable consequence of the exercise of that power is to destroy, injure or damage private property so as to substantially deprive the owner of the beneficial use or enjoyment of that property, *Harborcreek Township v. Ring,* 48 Pa. Commonwealth Ct. 542, 410 A.2d 917 (1980), and our scope of review in such a case is limited to determining whether or not competent evidence supports the findings of fact made by the court below and whether or not there was an error of law or an abuse of discretion. *City of Philadelphia v. Sterling Metalware Co.,* 48 Pa. Commonwealth Ct. 313, 410 A.2d 90 (1980).

The Authority first maintains that the appellee suffered no compensable injury or interference with the beneficial use of her property because she was never deprived of electrical service and there was no evidence presented that she lost tenants or income or that the marketability of her property was adversely affected.

It is clear, however, that the expenditure of substantial sums by the appellee was required in order to

---

[2] The Authority objected below to the procedure followed by the appellee when she sought a rule to show cause rather than an appointment of a board of view, but, at the evidentiary hearing, the parties agreed to waive any objection to procedural defects and they proceeded on the merits.

maintain the flow of electricity to her property and there is no dispute that without such expenditures, her electrical service would have been discontinued. We believe that the deprivation of electrical service would have seriously interfered with the appellee's use and enjoyment of her property and we must, therefore, agree with the court below that these expenditures represented an injury to the appellee's property rights.

It is next argued that the Authority's action was not the immediate, direct or necessary cause of the appellee's expenses because she was required by her contractual relationship with the utility to incur such costs as were involved here and, furthermore, that the appellee's old electrical system was in violation of the National Electrical Code (Code) and would have had to be corrected sometime in the future regardless of the Authority's conduct. Upon reviewing the record, however, we believe that the expenses incurred by the appellee were directly related to the actions of the Authority. The contractual relationship between the utility and the appellee designated only as between those two parties which of them must assume the costs of providing a suitable delivery point when the utility is required to relocate service underground and that agreement is irrelevant to the relationship between the Authority and the appellee. Although it is true that the old electrical system on the premises here concerned did not comply with the Code as adopted by the Building Code of the City of Oil City, the record reveals, and the court below held, that the appellee would not have been required to bring the system into compliance with the Code as long as she made no installations, alterations or extensions of her existing service. There was no indication that she had planned any such changes at any future time and we must therefore hold that the Authority's requirement that

the utility lines be placed underground was the direct and precipitating cause for the alteration of her electrical system and for the resulting expenditures she was compelled to make in order to maintain her service.

Finally, the Authority contends that, even if it is found that the appellee suffered an injury as a result of the Authority's action, the court below erred when it found that such action was in the nature of a condemnation under the power of eminent domain rather than a valid exercise of the police power. It is argued that a city has a right to use the police power to control whatever lies above or below its streets, regardless of the purpose for any proposed change. *See Wolf v. Department of Highways,* 422 Pa. 34, 220 A.2d 868 (1966). Although it is true, of course, that a city may have broad discretion in using the police powers to control its streets, *id.,* it is axiomatic that any exercise of the police power must be rationally related to the general health, safety and welfare and such an exercise may not be grounded solely on considerations of aesthetics. *Medinger Appeal,* 377 Pa. 217, 104 A.2d 118 (1954). There is substantial evidence here to support the lower court's finding that the Authority's requirement for the installation of underground electrical service was undertaken completely for aesthetic purposes and we must, therefore, conclude that such action was not an exercise of the police power but was an exercise of the power of eminent domain. We believe, therefore, that the appellee is entitled to just compensation.

We will affirm the order of the court below.

### ORDER

AND Now, this 29th day of June, 1981, the order of the Court of Common Pleas of Venango County in the above-captioned matter is hereby affirmed.

DISSENTING OPINION BY JUDGE CRAIG:

In an urban redevelopment project area, the existence of blight having been certified, municipal action to eliminate overhead utility lines, without taking any interest in property, constitutes an exercise of the police power.

At the threshold, it appears that there was no taking of an interest in property here. The majority opinion has concluded that there was a de facto condemnation because the "expenditures" made by the property owner to connect with underground electrical service "represented an injury to the appellee's property rights." Where no property interest can be identified as having been taken, the impact of personal expenditures of the property owner do not constitute an injury to the property, particularly if such expenditures are the price of compliance with a requirement founded upon the police power.

Hence, the presence or absence of a police power basis is, as the majority opinion recognizes, important.

The sole basis on which a police power justification has been negated is the lower court's finding that requiring underground electrical service was based completely upon aesthetic purposes. Study of the exhibits, as well as the testimony, discloses no evidence linking the requirement with aesthetic goals. The only possible source of such a view would be, in the Redevelopment Proposal, under *"C. Land Use Plan"*, item 4, General Design Objectives, which item describes the purpose of those design objectives as

> to promote a functional, attractive and visually appealing environment in the Downtown Urban Renewal Area.

The same passage relates those design objectives to pedestrian walks, materials for street furniture, open space, off-street loading, signs and landscaping. The requirement pertinent to this case

3. *Underground Utility Lines*

All public and private utilities for new construction shall be placed underground. Existing above ground shall be incorporated into the underground system.

is found under *"D. Project Proposals"*, a section of the redevelopment proposal distinct from the section dealing with design objectives and land use plan.

The police power benefits derived, as to safety in particular, in eliminating overhead electrical wires and placing them within the protection of underground installation, are apparent.

Moreover, in the context of the redevelopment process, properties not taken stand to benefit from the improvement and elimination of blight in the redevelopment area in which they are located. In the redevelopment process, the courts have accorded a wide scope to the police power. The broad sweep of that concept was expressed by the United States Supreme Court in *Berman v. Parker,* 348 U.S. 26, 32-33 (1954) with the words:

Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. . . . The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patroled. . . .

Although *Berman v. Parker* dealt with the realization of police power goals through the exercise of eminent domain, that fact does not shrink the breadth of the

Supreme Court's description of the police power itself.

In *Oliver v. Clairton,* 374 Pa. 333, 340, 98 A.2d 47, 51 (1953), the Pennsylvania Supreme Court took note of the elements which can constitute blight, embracing not only unsafe or unsanitary conditions, but also inadequate planning, or the lack of proper light, air and open space, or the defective design and arrangement of buildings, faulty street or lot layout, or economically or socially undersirable land uses—adding that any one of those conditions is sufficient to warrant a certification of blight.

In such a context, the regulatory powers used by government, to attack blight, should be viewed liberally, and we should not incline to view a regulation as a taking when the property is left intact and the impact consists only of the expense of compliance with a regulatory requirement.

Judge MacPhail joins in this dissent.