445 A.2d 724

**REDEVELOPMENT AUTHORITY OF OIL CITY, Appellant,**

v.

**Jane T. WOODRING, Appellee.**

Supreme Court of Pennsylvania.

Argued March 1, 1982.

Decided May 26, 1982.

John D. Rynd, Jr., Rynd & Olmes, Oil City, for appellant.

Benjamin G. McFate, Oil City, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION

LARSEN, Justice.

On May 17, 1978, appellee, Jane T. Woodring, filed a petition for the appointment of a board of viewers in the Venango County Court of Common Pleas,[1] alleging that the actions of appellant, the Redevelopment Authority of Oil City (hereinafter Authority),[2] constituted a de facto taking of her property, and that she was entitled to just compensation.[3]

After an evidentiary hearing on the petition, the court of common pleas concluded that a de facto taking had occurred and directed the appointment of a board of viewers to ascertain just compensation for Mrs. Woodring. On appeal, the Commonwealth Court affirmed. *Redevelopment Authority of Oil City v. Woodring*, 60 Pa.Commw. 234, 430 A.2d 1243 (1981). We granted allocatur and we now affirm.

1. The Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, 26 P.S. § 1–101, et seq., provides:
   If there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers ... setting forth such injury. 26 P.S. § 1–502(e) (1981–82 supp.).

2. The Authority is a public body which exercises public powers as an agency of the Commonwealth and which possesses the power of eminent domain. *See* Act of May 24, 1945, P.L. 991, § 9, as amended, 35 P.S. § 1709(i).

3. Article 1, § 10 of the Pennsylvania Constitution provides, in pertinent part:
   [N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.
   Further, the Eminent Domain Code provides that
   [t]he condemnee shall be entitled to just compensation for the taking, injury or destruction of his property, determined as set forth in this article.
   26 P.S. § 1–601 (1981–82 supp.).

On May 21, 1974, the City Council of Oil City approved an urban redevelopment proposal submitted by the Authority. The proposal required, among other things, that "[e]xisting above ground utilities shall be incorporated into the underground system" along Elm Street in downtown Oil City. Mrs. Woodring owns several buildings, used for residential and commercial purposes, on Elm Street.

On August 9, 1976, construction of the new underground system began and the Authority invited Elm Street property owners to a meeting to discuss the relocation of their electrical service. Mrs. Woodring attended this meeting. A memorandum of the meeting, dated August 13, 1976 and sent to Elm Street property owners, indicates that the Authority planned to install underground service conduits ending at each owner's property line; that property owners were responsible for providing the encasement conduit for electrical service from their buildings to the property line; and that Pennsylvania Electric Company, pursuant to its tariff, was obligated to provide and reconnect all wiring for the relocation.[4] According to the memorandum, construction was to be completed within three to five months, and the changeover of service was to take place in early 1977.

Upon receipt of this memorandum, Mrs. Woodring employed an electrical contractor who installed new electrical connections in her buildings. Mrs. Woodring alleged in her petition that this work cost in excess of $5,000.

It is the contention of the Authority on this appeal that Mrs. Woodring is not entitled to compensation because (1) the Authority never exercised its power of eminent domain; (2) even if it did, Mrs. Woodring was never deprived of the use and enjoyment of her property; and (3) even if Mrs. Woodring was, that deprivation was not the immediate,

4. Pursuant to the redevelopment plan, telephone and TV cables also had to be relocated underground. However, the memorandum indicates that the telephone and cable TV company tariffs provided that relocation of those services would be completed at no cost to property owners.

necessary and unavoidable consequence of any action on the Authority's part.[5]

[1] Compensation under the Eminent Domain Code does not require an actual taking. Rather, a taking occurs within the meaning of the Code, and compensation is due, whenever "the entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property." *Griggs v. Allegheny County*, 402 Pa. 411, 414, 168 A.2d 123, 124 (1961), *rev'd on other grounds*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). *See also Conroy-Prugh Glass Company v. Commonwealth, Department of Transportation*, 456 Pa. 384, 388, 321 A.2d 598, 599 (1974); *Monaco v. Commonwealth, Department of Transportation*, 26 Pa. Commw. 387, 363 A.2d 857, 859 (1976) ("[W]here an entity, clothed with the power of eminent domain, exercises that power and the immediate, necessary, and unavoidable consequence of that exercise is to destroy, injure or damage private property so as to substantially deprive an owner of the beneficial use and enjoyment thereof, [a] . . . 'de facto' taking of said property has occurred and just compensation must be paid.").[6]

I.

The Authority first argues that its decision requiring all electrical wires to be relocated underground constituted an exercise of police power, not an exercise of its power of eminent domain. This argument is without merit.

**5.** The Authority also contends that there was no taking because there was no permanent interference with access to Mrs. Woodring's property within the meaning of § 612 of the Eminent Domain Code, 26 P.S. § 1–612, and because Mrs. Woodring's petition contained no claim for consequential damages. However, these contentions deal only with a property owner's right to receive consequential damages in appropriate cases, a right which is not at issue on this appeal. Since they have no bearing on the existence or absence of a compensable taking, they merit no further discussion.

**6.** Our scope of review is limited to determining whether or not there is competent evidence in the record to support the findings made by the court of common pleas, and whether or not any errors of law were committed. *See City of Philadelphia v. Sterling Metalware Company*, 48 Pa.Commw. 313, 410 A.2d 90, 91 (1980).

■ Police power involves the regulation of property to promote health, safety and general welfare and its exercise requires no compensation to the property owner, even if there is an actual taking or destruction of property, while eminent domain is the power to take property for public use, and compensation must be given for property taken, injured or destroyed. *White's Appeal*, 287 Pa. 259, 264, 134 A. 409 (1926).

In a case involving the constitutionality of a zoning ordinance, this Court held that "neither aesthetic reasons nor the conservation of property values or the stabilization of economic values in a township are, singly or combined, sufficient to promote the health or the morals or the safety or the general welfare of the township or its inhabitants or property owners." *Medinger Appeal*, 377 Pa. 217, 226, 104 A.2d 118, 122 (1954). This Court concluded that actions taken in furtherance of these objectives could, therefore, never constitute an exercise of the police power. This definition of police power is equally applicable in a case where there is an alleged exercise of the power of eminent domain; police power is the same, whether it is used to justify a zoning ordinance or a taking for public use without compensation, pursuant to an urban redevelopment plan.

In the instant case, the introduction to the Authority's proposal states that Oil City has experienced deterioration due to a "general lack of aesthetics," and that the potential for improvement can be realized through "the provision of public improvements necessary to create an esthetically appealing environment"; the proposal's project description states that one of the objectives of the plan is to improve economic vitality "by creating an attractive environment"; and the proposal's design objectives "were developed to promote a functional, attractive and visually appealing environment in the Downtown Urban Renewal Area." In addition, the letter of April 15, 1974 which the Authority received from Quaker State Oil Refining Corporation concerning Quaker State's new corporate headquarters, to be built in Oil City in conjunction with the Authority's redevelopment plan, states:

Further, the Mayor of Oil City and the City Manager of Oil City verbally agreed to the removal of all overhead wiring on both sides of Elm Street facing the proposed Quaker State office building and *as a factor consistent with attractive external appearance.*
(Emphasis supplied.)

■ The finding of the court of common pleas that "[t]he action of defendant [the Authority] was taken on the basis of aesthetic considerations only" is supported by the record, and that court was thus correct when it concluded that the Authority's action in this case constituted an exercise of its power of eminent domain and not an exercise of police power.[7]

## II.

■ The Authority advances two arguments in support of its contention that Mrs. Woodring was not deprived of the use and enjoyment of her property: first, that only the location of her electrical service was changed; and second, that the electrical work Mrs. Woodring had done in her buildings actually enhanced the value of her property. Both of these arguments are without merit.

The Authority did not change the location of Mrs. Woodring's electrical service. Rather, Mrs. Woodring changed the location of her electrical service in response to the Authority's announcement that by early 1977 her overhead electrical service would be discontinued. If Mrs. Woodring had been unable to bear the expense of installing new electrical connections in her buildings, the Authority's plan would have left her with no electricity. As the court of common pleas correctly concluded:

7. The Authority's reliance upon ordinances which subject Pennsylvania Electric Company to the police powers of Oil City, and the claim in the Authority's brief that "we are involved with the city's power to control . . . the operations of Pennsylvania Electric Company therein," are misdirected, since the issue is not whether there was an exercise of police power with respect to Pennsylvania Electric Company, but whether there was an exercise of police power with respect to Mrs. Woodring's property.

[P]laintiff [Mrs. Woodring] had to spend large sums of money in order to convert her electrical facilities to accommodate defendant's [the Authority's] actions and thus continue her electric service. If she had not done so, her use of the property would have been permanently interfered with because of lack of service.

We conclude that the Authority's action substantially deprived Mrs. Woodring of the use and enjoyment of her property, and that it thus constituted a taking within the meaning of the Eminent Domain Code.

▇ In addition, we hold that the fact that any changes Mrs. Woodring chose to make after the Authority had effected a taking may have ultimately enhanced the value of her property is irrelevant, since changes in value brought about by a property owner after a taking has occurred have no bearing on the existence or absence of a taking in the first instance.[8]

### III.

Finally, the Authority argues that the changes Mrs. Woodring made in the electrical system of her buildings were not the immediate, necessary or unavoidable consequence of any action on its part.[9] This argument also lacks merit.

---

**8.** Even when changes in value are relevant, as in the assessment of just compensation, the issue is not the effect of a property owner's subsequent actions on the value of the property, but the effect of a condemnor's prior actions on the value of the property at the moment of condemnation. *See* 26 P.S. § 1–602(a). ("Just compensation shall consist of the difference between the fair market value of the condemnee's entire property interest immediately before the condemnation ... and the fair market value of his property interest remaining immediately after such condemnation ....")

**9.** Although this issue was raised before the court of common pleas, that court made no specific finding as to causation. Nevertheless, implicit in the disposition of this case by the court of common pleas is that court's conclusion that it was the Authority, and not Pennsylvania Electric Company, which was responsible for requiring Mrs. Woodring to relocate her electrical services. Our review of the evidence in this case leads us to the same conclusion.

The Authority first argues that the changes Mrs. Woodring made were required not by its redevelopment plan, but by the provisions of the Authority's agreement with Pennsylvania Electric Company and the electric company's tariff.

Pennsylvania Electric Company's Tariff of Rates, Rules and Regulations, filed pursuant to the Public Utility Commission's order of June 2, 1976, states:

In the event [Pennsylvania Electric] Company *may be required by any public authority* to place underground any portion of its mains, wires or services or relocate any pole or feeders, the customer at own expense shall change the location of delivery point to that readily accessible to the new location.

(Emphasis supplied.)

The agreement of June 21, 1976, entered into between Pennsylvania Electric Company and the Authority in connection with the redevelopment plan, contains the following:

*WHEREAS, Authority has formed an urban renewal plan for the project area* which includes, inter alia, provisions for the placing underground or beneath the surface all public utility main and service lines in the area and the removal of all existing overhead or otherwise exposed public utility main and service lines, which urban renewal plan has been approved and adopted by the City of Oil City on May 21, 1974, by Resolution Number 74–12, ...

(Emphasis supplied.)

It is clear that the tariff and the agreement, both issued two years after the Authority's urban redevelopment plan was approved, were issued pursuant to the requirements of that plan and not independently of it. Thus, we conclude that the Authority's redevelopment plan, rather than the cited sections of the agreement and the tariff, was the immediate, necessary and unavoidable cause of the changes Mrs. Woodring was required to make in order to accommo-

date her property to the underground system referred to in the Authority's plan.[10]

■ The Authority also argues that a second provision of Pennsylvania Electric Company's tariff was the cause of the electrical work Mrs. Woodring had done. That tariff provision states:

> All wiring shall be installed and maintained in accordance with the provisions of the National Electrical Code and [Pennsylvania Electric] Company's standard requirements. . . .

Frank Lewis, a representative of Pennsylvania Electric Company, inspected Mrs. Woodring's buildings in 1976 in connection with the redevelopment plan, before any electrical work had been done. At that time there was evidence that Mrs. Woodring's electrical system violated the National Electrical Code.[11] Nevertheless, there was no evidence that any violation was in any way related to the work that had to be completed in order to relocate Mrs. Woodring's electrical service pursuant to the Authority's redevelopment plan. In fact, both Mrs. Woodring and Mr. Lewis testified at the hearing that Pennsylvania Electric Company had never notified Mrs. Woodring that the electrical system in her buildings violated the National Electrical Code or that Pennsylva-

10. This conclusion is further supported by the facts that it was the Authority who invited Elm Street property owners to the meeting of August 12, 1976 to discuss the impact of the redevelopment plan, and that it was the Authority's consulting engineer who drafted and circulated the memorandum of August 13, 1976 which outlined the positions of the various parties affected by the plan. These facts indicate that at all times relevant in this case, the Authority was directing and controlling the implementation of its plan.

11. Mr. Lewis testified that Mrs. Woodring's electrical system violated § 230–72 of the National Electrical Code, 1975 edition, which requires that service disconnects be accessible to tenants in case of fire. This violation was based on the fact that five disconnects were located inside a jewelry store protected by a burglar alarm. Since the other tenants in the building could not reach the service disconnects without setting off the jewelry store's burglar alarm, Mr. Lewis was of the opinion that these disconnects were inaccessible and that this inaccessibility constituted a violation of the National Electrical Code.

nia Electric Company would discontinue her service because of any such violation. Moreover, at the time of the hearing in this case in September, 1978, Pennsylvania Electric Company was still servicing Mrs. Woodring's buildings through the same allegedly faulty connections it had inspected in 1976.

The changes which Mrs. Woodring was required to make were not necessitated by Pennsylvania Electric Company or its tariff, but were solely the result of the actions of the Authority.

Order of the Commonwealth Court affirmed.

ROBERTS, J., filed a concurring opinion in which NIX and HUTCHINSON, JJ., joined.

ROBERTS, Justice, concurring.

In view of the finding of the court of common pleas that appellant's decision to relocate power lines was motivated by purely aesthetic considerations and the absence of contrary evidence of record, I agree that appellee is entitled to the appointment of a board of viewers to determine just compensation. That compensation, however, should not include payment for any expenses incurred by appellee in bringing her property's electrical system into compliance with the National Electrical Code of 1975.

The record reveals that, prior to appellant's decision to relocate existing power lines underground as part of its redevelopment plan, appellee's tenants did not have individual access to a means of disconnecting their electricity in the event of a fire or other emergency. According to appellee's own witness, Frank Lewis, a Pennsylvania Electric Company meter supervisor, this condition constituted a violation of the National Electrical Code, section 230–72 (1975 edition). Supervisor Lewis further testified that if appellee had at any time desired to alter or add to her existing system, she would have been required by Oil City ordinances nos. 2119 and 2223 to bring her system into compliance with the Code.

It goes without saying that municipal ordinances requiring safe electrical systems are valid exercises of the police power, and that any expenses incurred in correcting a violation must be borne by the violator. Although appellant's decision to relocate power lines precipitated the change in appellee's electrical system which made her subject to the ordinances, the fact remains that a part of appellee's expenses in converting her system were incurred not to satisfy the Redevelopment Authority's desire for aesthetic improvement but rather to satisfy Oil City's legitimate concern that appellee's tenants be safe. Accordingly, the Board of Viewers should be directed to exclude from compensation all amounts paid by appellee to bring her electrical system into compliance with the National Electrical Code.

NIX and HUTCHINSON, JJ., join in this concurring opinion.