[No. 33892. *En Banc.* January 14, 1960.]

GEORGE ACKERMAN *et al., Appellants,* v. THE PORT
OF SEATTLE, *Respondent.*[1]

[1]Reported in 348 P. (2d) 664.

*Breskin & Hilyer,* for appellants.

*Bogle, Bogle & Gates, Tom M. Alderson,* and *J. Kenneth Brody,* for respondent.

*The Attorney General* and *James R. Cunningham, Assistant, amici curiae.*

FINLEY, J.—In 1949, the respondent, The Port of Seattle (hereinafter referred to as the Port), commenced operation of the Seattle-Tacoma International Airport. On June 15, 1955, thirty property owners living near the airport instituted suit against the Port and all of the scheduled airlines using the airport to recover the diminution in market value of their land, allegedly caused by the activities of the Port and the airlines. Between June 15, 1955,

and January 1956, thirty-seven additional property owners, including the five appellants, were joined as parties plaintiff by court order, making a total of sixty-seven plaintiffs.

The trial court granted summary judgment against six of the plaintiffs. For the facts and circumstances surrounding that judgment, see *Anderson v. Port of Seattle* (1956), 49 Wn. (2d) 528, 304 P. (2d) 705.

The Port and the airlines all demurred to the complaints of the remaining sixty-one plaintiffs. The trial court overruled the demurrer as to fifty-six plaintiffs, but sustained it as to the five appellants. Subsequently, pursuant to a stipulation between the airlines and the appellants, the order sustaining the demurrer of the airlines was vacated. Thus, the sole question raised on this appeal is whether the trial court erred in sustaining the demurrer of the Port as to the five appellants.

Although there are several appellants, there is but one basic complaint. Essentially, it alleges that, because of the failure of the Port to provide adequate facilities, the property of the appellants has been and is continuing to be used as an approach way for airplanes landing or taking off from the airport. It is alleged that as many as one hundred airplanes per day pass directly over the appellants' land at altitudes as low as one hundred feet, and that as a result of the noise and fear thus produced, the value of the land has been substantially diminished. It is further alleged that the Port, having the power of eminent domain, has nevertheless failed to acquire the property used for approach ways, either by purchase or by appropriate condemnation proceedings. It is also alleged that airplanes, warming up on the airport runways, are unreasonably interfering with the use and enjoyment of appellants' land. We think that the significant claim of appellants in this case concerns the alleged numerous low flights directly over their land. Appellants rely upon (1) a theory of constitutional taking; *i.e.*, a taking of private property for public use without first paying just compensation, contrary to Art.

I, § 16, and amendment 9, Washington state constitution;[2] (2) a theory of common law trespass; or (3) nuisance. If the complaint is sustainable on the theory of constitutional taking, the trial court's order sustaining the Port's demurrer must be reversed, and any discussion of the common law concepts of trespass or nuisance is unnecessary.

Counsel for the Port have suggested that the court's basis for the order sustaining the demurrer was that the appellants' suit was barred by the three-year statute of limitations. They point out that the complaints allege that the acts which occasion this litigation have been continuous from and after June 15, 1952, but that the five appellants did not become parties until after June 15, 1955. However, if this was the reason for the trial judge's action, it would seem that he would have sustained the demurrer as to the other thirty-two plaintiffs who joined the original thirty plaintiffs after June 15, 1955. On the contrary, it appears that the reason behind the order sustaining the demurrer as to the five appellants was that they, unlike the fifty-six plaintiffs as to whom the Port's demurrer was overruled, are owners of vacant and unoccupied land. As to vacant land, the trial judge apparently concluded that the law does not recognize as compensable the type of harm which the appellants allege has occurred in this case.

---

[2]Throughout this opinion, the plaintiffs' basic theory of liability is referred to or characterized as a constitutional taking, as above briefly defined. The words, "unconstitutional taking," (which at first glance might be thought to more accurately describe this theory of liability, in as much as the plaintiffs' claim is that their land has been appropriated for public use in violation of the constitution) seem to us on closer analysis to carry an inference or suggestion that the alleged acts of the Port are prohibited *absolutely* by the constitution. On the other hand, it may be conceded that in describing the plaintiffs' theory as a constitutional taking, there is some inference that the acts of the defendant were legal and valid, from which it would follow that the plaintiffs would not be entitled to the relief they seek. However, the latter inference is negatived if the term "constitutional taking" is regarded in the sense or from the standpoint of the governmental unit having the power of eminent domain, Viewed thusly, the term denotes the exercise of a constitutionally created power to appropriate private property for public purposes; a condition precedent to the valid exercise of this power nevertheless being that just compensation first be paid to the property owner.

Assuming that in all other respects the complaints state a cause of action for constitutional taking, we cannot agree with this apparent conclusion of the trial court. The actual monetary damage to developed land may well be greater than to vacant land. "But it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking." *United States v. Cress* (1916), 243 U. S. 316, 328, 61 L. Ed. 746, 37 S. Ct. 380; *United States v. Causby* (1946), 328 U. S. 256, 90 L. Ed. 1206, 66 S. Ct. 1062. "The path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value." *United States v. Causby, supra,* p. 262.

Furthermore, if the Port is liable for a constitutional taking, the trial court would be in error for sustaining the demurrer, even if the basis for the court's action was the three-year statute of limitations. We have held that an action for constitutional taking is not barred by any statute of limitations and may be brought at any time before title to the property taken is acquired by prescription. The prescriptive period in this state has been held to be ten years. See *Aylmore v. Seattle* (1918), 100 Wash. 515, 171 Pac. 659; *Domrese v. Roslyn* (1918), 101 Wash. 372, 172 Pac. 243; *Litka v. Anacortes* (1932), 167 Wash. 259, 9 P. (2d) 88. This holding is consistent with the prevailing rule in many other states having constitutional provisions similar to ours. See for example *Carter v. Ridge Turnpike Co.* (1904), 208 Pa. 565, 57 Atl. 988. In that case the supreme court of Pennsylvania pointed out that the right to compensation for a governmental taking under the power of eminent domain is not merely a common law or statutory right, but is a constitutional right. It held that " . . . no statute of limitations can bar [plaintiff's] *constitutional right* to actual compensation . . . " (Italics ours.) In *Faulk v. Missouri River & N. W. Ry. Co.* (1911), 28 S. D.

1, 132 N. W. 233, the South Dakota court cited the Pennsylvania decision with approval, stating:

" . . . if it was competent for the Legislature to make any provisions limiting the time for commencing an action by the owner, it could make such provisions as would effectually abrogate or fritter away the guaranty of the Constitution."

Admittedly, we have indicated that where property is not actually appropriated, but is merely damaged, the three-year statute of limitations (RCW 4.16.080(3)) might well be applicable. *Papac v. Montesano* (1956), 49 Wn. (2d) 484, 303 P. (2d) 654; *Gillam v. Centralia* (1942), 14 Wn. (2d) 523, 128 P. (2d) 661; *Marshall v. Whatcom County* (1927), 143 Wash. 506, 255 Pac. 654; *Jacobs v. Seattle* (1918), 100 Wash. 524, 171 Pac. 662. This court has never recognized the doctrine of acquisition of a prescriptive right to commit damage to property in the absence of an actual physical invasion of the property. Therefore, to prevent stale claims, a reasonable statute of limitations may be applied as to even a constitutional right, as was suggested in *Kincaid v. Seattle* (1913), 74 Wash. 617, 134 Pac. 504, 135 Pac. 820. The three-year statute of limitations suggested in the above-cited cases seems to us reasonable. Thus, we hold that, with respect to the appellants' allegations of incidental damaging caused by airplanes warming up on the airport runways, the three-year statute of limitations constitutes a bar, accord *Cheskov v. Port of Seattle* (1960), *infra*, 416, 348 P. (2d) 673.

We turn now to the major question: whether, under the facts alleged, the appellants have stated a cause of action against the Port for a constitutional taking.

For convenience we shall divide our discussion of this question into two segments: (1) whether the alleged continuing and frequent low flights over the appellants' land constitutes a taking of their property; and (2) whether the Port—which operates no airplanes—is liable for such a taking.

The fundamental problem presented by this appeal is relatively new. It is of considerable interest and signifi-

cance at the present time, and, in view of the modern developments in the field of air transportation, it is likely to become much more important in the future.

In the University of Illinois Law Forum (Vol. 1956, No. 2, p. 232), Judge Roger J. Traynor of the supreme court of California stated:

"More than ever social problems find their solution in legislation. Endless problems remain, however, which the courts must resolve without benefit of legislation. The great mass of cases are decided within the confines of stare decisis. Yet there is a steady evolution, for it is not quite true that there is nothing new under the sun; rarely is a case identical with the ones that went before. Courts have a creative job to do when they find that a rule has lost its touch with reality and should be abandoned or reformulated to meet new conditions and new moral values. And in those cases where there is no stare decisis to cast its light or shadow, the courts must hammer out new rules that will respect whatever values of the past have survived the tests of reason and experience and anticipate what contemporary values will best meet those tests. The task is not easy—human relations are infinitely complex, and subtlety and depth of spirit must enter into their regulation. Often legal problems elude any final solution, and courts then can do no more than find what Cardozo called the least erroneous answers to insoluble problems."

The invention of the airplane and the development of modern air transportation (with resulting changes in human relationships) have occurred somewhat subsequently to the development of the legal concepts emphasized in formulating early common law theories of liability. An awareness of these changes makes it incumbent upon us to heed the advice of the framers of the Washington constitution when they said:

" . . . A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." Washington constitution, Art. I, § 32.

One of the fundamental principles involved in this action is the ownership of private property and the right to the free use and enjoyment thereof. Another basic

principle is the authority of the government (always subject to constitutional safeguards) to regulate the use and utilization of private property for the promotion of the public welfare. At times, as in the instant litigation, these principles are in conflict, and the courts are called upon to resolve the resulting problem in human and legal relationships. In doing so, the courts constantly emphasize the concepts of (1) "regulation" under the police power, and (2) "constitutional taking or damaging" under the eminent domain power. When restrictions upon the ownership of private property fall into the category of "proper exercise of the police power," they, validly, may be imposed without payment of compensation. The difficulty arises in deciding whether a restriction is an exercise of the police power or an exercise of the eminent domain power. When private property rights are actually destroyed through the governmental action, then police power rules are *usually* applicable. See *State ex rel. Miller v. Cain* (1952), 40 Wn. (2d) 216, 242 P. (2d) 505. But, when private property rights are taken from the individual and are conferred upon the public for public use, eminent domain principles are applicable. See, generally, *Conger v. Pierce County* (1921), 116 Wash. 27, 198 Pac. 377, 18 A. L. R. 393.

In this connection it is well to recall the words of Justice Holmes in *Pennsylvania Coal Co. v. Mahon* (1922), 260 U. S. 393, 415, 416, 67 L. Ed. 322, 43 S. Ct. 158; 28 A. L. R. 1321:

" . . . The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. . . . [Citing case.] When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

" . . . *We are in danger of forgetting that a strong public desire to improve the public condition is not enough*

*to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. . . ."* (Italics ours.)

It is conceded that the operation of the "Sea-Tac" air terminal by the Port of Seattle is for the public good. Even so, appellants allege that the operation of the air terminal has resulted in an interference with the use of their private property, which action they seek to characterize as a constitutional taking of their property.

What is property? In *Spann v. Dallas* (1921), 111 Tex. 350, 355, 235 S. W. 513, 19 A. L. R. 1387, the Texas court says:

"Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal. Anything which destroys any of these elements of property, to that extent destroys the property itself. The substantial value of property lies in its use. If the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right."

See, also *State ex rel. Smith v. Superior Court* (1901), 26 Wash. 278, 66 Pac. 385; *Great Northern R. Co. v. State* (1918), 102 Wash. 348, 173 Pac. 40.

In *United States v. Causby, supra,* the United States supreme court said:

" . . . it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run. The principle is recognized when the law gives a remedy in case overhanging structures are erected on adjoining land. *The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. . . .* [Citation.] *The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material."* (Italics ours.)

The Port contends that Congress has made the "airspace" a public highway, and, therefore, appellants have never owned any rights in the airspace which could be subject to a governmental taking. In support of this position, the

respondent points to the two following statements contained in *United States v. Causby, supra:*

(1) "The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, *apart from the immediate reaches above the land,* is part of the public domain. We need not determine at this time what those precise limits are." (Italics ours.)

(2) ". . . the flights in question were not within the navigable airspace which Congress placed within the public domain. If any airspace needed for landing or taking off were included, flights which were so close to the land as to render it uninhabitable would be immune. But the United States concedes, as we have said, that in that event *there would be a taking.*" (Italics ours.)

The Port contends that at the time of the *Causby* case the regulations of the Civil Aeronautics Act did not clearly prescribe that altitudes necessary for taking off and landing were included in the words, *minimum safe altitude;* it further contends that the regulations have since been amended to clarify that language. This argument overlooks: (a) the italicized portion of the first quotation set out above, and (b) the significance of the second above-quoted statement when read in the full context, as follows:

"The fact that the path of glide taken by the planes was that approved by the Civil Aeronautics Authority does not change the result. The navigable airspace which Congress has placed in the public domain is 'airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority.' 49 U.S.C. § 180. *If that agency prescribed 83 feet as the minimum safe altitude, then we would have presented the question of the validity of the regulation.* But nothing of the sort has been done. *The path of glide governs the method of operating — of landing or taking off. The altitude required for that operation is not the minimum safe altitude of flight which is the downward reach of the navigable airspace.* . . . Hence, the flights in question were not within the navigable airspace which Congress placed within the public domain. If any airspace needed for landing or taking off were included, flights which were so close to the land as to render

it uninhabitable would be immune. *But the United States concedes, as we have said, that in that event there would be a taking.* Thus, it is apparent that the path of glide is not the minimum safe altitude of flight within the meaning of the statute. The Civil Aeronautics Authority has, of course, the power to prescribe air traffic rules. But Congress has defined navigable airspace only in terms of one of them—the minimum safe altitudes of flight." (Italics ours.)

Section 60.17 of the Civil Air Regulations, which establishes minimum safe altitudes, is presently prefaced with the following exception: "Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes . . ." 14 C. F. R., § 60.17 (1956). It is the position of the civil aeronautics board that a plane is operating within the navigable airspace when flying a normal and necessary path in approaching or leaving an airport. 19 Fed. Reg. 4602-03 (1954). *This is contrary to the decision of the United States supreme court in the Causby case, supra, and we believe, is contrary to reason.*

 Occasionally, an extreme—seemingly absurd—illustration can be illuminating. Probably no one would assert a right to compensation for *a taking,* if the state constructed a road on the public domain. However, if the state first declared certain private lands to be public domain and then built a road thereon, it is quite apparent that there would be a violation of Art. I, § 16, amendment 9, of the Washington constitution. We believe this is as true with *space in the air* as it is with the *surface of land.* The government simply cannot arbitrarily declare that *all* of the airspace over a person's land is public domain and then, cavalierly, claim absolute immunity against property owners' claims for any and all possible damages. We think that is what the court meant in the *Causby* case, *supra,* when it said that, if the Civil Aeronautics Act had prescribed the minimum safe altitude of flight to be 83 feet, there would have been a question as to the *validity of the regulation* as an articulation of government police power. Any prescribed safe minimum altitude of flight must be reasonable. The present standards for flight (500 feet over

noncongested areas, and 1,000 feet above the nearest obstacle over congested areas) have been accepted as reasonable. Any attempted prescription of a lower altitude is subject to examination for its reasonableness and to a determination as to whether it amounts to a constitutional taking of one's property.

 In landing and taking off, a plane necessarily flies a few feet, even a few inches, above the ground for some instants. Whether this occurs over airport property or over private property depends upon the size and type of the plane, as well as the size of the airport and the length of the particular runway. We do not believe that the Civil Aeronautics Act is to be interpreted as allowing the civil aeronautics board to place such flights over private property within the public domain. Such an interpretation would be a strained and unnatural construction of the language of the act. Congress has defined *navigable airspace* (*public domain*) only in terms of minimum safe altitudes of flight; this definition has not been changed since the *Causby* case, *supra*. "Thus, it is apparent that the path of glide" used by planes in landing and taking off from airports "is not the minimum safe altitude of flight within the meaning of the statute." *United States v. Causby, supra.*

This interpretation of Congress' declaration as to what constitutes public domain in the airspace is supported by the Federal government's policy of condemning and compensating for air easements over property adjoining Federal air bases. See *United States v. 48.10 Acres of Land, Etc.* (1956), S.D.N.Y., 144 F. Supp. 258; *United States v. 4.43 Acres of Land, Etc.* (1956), N. D. Tex., 137 F. Supp. 567. The easements are taken according to the "glide angle plane" used in landing and in taking off.

 We hold, therefore, that the alleged continuing and frequent low flights over the appellants' land amount to a taking of an air easement for the purpose of flying airplanes over the land.

 We must now take up the question of whether, under the facts alleged, the Port—which operates no planes

—can be liable for the alleged taking. As we earlier noted, the liability of the Port in appellants' complaints is predicated on the Port's alleged failure to provide adequate facilities, necessitating the frequent low flights over the appellants' land (and thus, as we have seen, through the appellants' private airspace). Having the power to acquire an approach way by condemnation, the Port, allegedly, failed to exercise that power, with the result that the appellants' private airspace is allegedly being used as an approach way, without just compensation first having been paid to them. Clearly, an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed, if the private airspace of adjacent landowners is not to be invaded by airplanes using the airport. The taking of an approach way is thus reasonably necessary to the maintenance and operation of the airstrip. "The taking or damaging of land to the extent reasonably necessary to the *maintenance and operation of other property devoted to a public use,* is a taking or damaging for a public use and subject to the provisions of Art. I, § 16 (amendment 9) of the state constitution." (Italics ours.) *Anderson v. Port of Seattle, supra.* Therefore, we conclude that in the instant case the appellants have not only successfully pleaded an unconstitutional taking, but further, they have alleged such a taking by the Port.

Since the present case must be remanded for a trial on the merits, we would be remiss if we did not provide some guidance to the trial court respecting the measure of compensation.

As the appellants' claim of incidental damaging is barred by the statute of limitations, trial on remand will be limited to proof of the allegations encompassed in the appellants' theory of a constitutional taking. If, upon trial, their claims are sustained by substantial evidence, the appellants would be entitled to the difference between the value of their property before the airport was extensively used and the value thereafter, plus interest from that date. See *Anderson v. Port of Seattle, supra.* If the evidence

indicates that extensive use of the airport commenced prior to June 15, 1952 (the date alleged in the complaint), but less than ten years prior to the date when appellants became parties to this action, an amendment to the pleadings to that effect would be in order. *Laucks v. Hartford Fire Ins. Co.* (1929), 152 Wash. 241, 277 Pac. 834. With respect to costs, see *Little v. King County* (1930), 159 Wash. 326, 293 Pac. 438.

The order sustaining the demurrer as to appellants is reversed, and the case is remanded for proceedings consistent with the views expressed in this opinion.

WEAVER, C. J., DONWORTH, ROSELLINI, OTT, FOSTER, and HUNTER, JJ., concur.

HILL, J., concurs in the result.

MALLERY, J. (dissenting)—The plaintiffs are owners of unimproved properties in the general vicinity of the Seattle-Tacoma airport. They seek damages for diminished property values caused by aircraft flying over their property about one hundred times a day at an elevation of less than five hundred feet. The diminished values are attributed to the noise of the aircraft and the fear they engender.

It is not alleged that the Port of Seattle operates the aircraft or is responsible for the air lines under the doctrine of *respondeat superior.*

Plaintiffs predicate the liability of the Port of Seattle on the theory that it knew the air lines would trespass on plaintiffs' properties, because the airport has insufficient area. They do not allege that the dimensions or layout of the airport is in violation of any governmental regulation. They do not allege the distances of their properties from the airport. They do not allege that the air lines cannot operate lawfully because of the size of the airport and do not plead the breach of any regulation governing the operation of aircraft. The bare allegation of insufficient area for the airport is a conclusion of law and not a well-pleaded fact.

An action for diminished value of property, caused by

noise and fear incident to the distant landing and take off of airplanes is a nuisance action.

The existence of the airport is specifically authorized by statute, and no violation of any city, state, or Federal zoning or other regulation is alleged. RCW 7.48.160 [cf. Rem. Rev. Stat., § 9916] provides: "Nothing which is done or maintained under the express authority of a statute, can be deemed a nuisance."

Curiously enough, the majority opinion, without holding that the plaintiffs have a cause of action for nuisance, proceeds to hold that there is a constitutional taking of the plaintiffs' land for public use by reason of damages characteristic of a nuisance, rather than a trespass.

This theory of a constitutional taking is the application of an outmoded legal fiction no longer necessary or useful. It had its origin in the immunity of the sovereign, which could be circumvented only by invoking the constitutional prohibition against the taking of private property for public use without compensation. Thus, where manifest private hardship and injustice flowed from a public activity, the legal fiction of a constitutional taking of property served a useful purpose in certain instances. Sovereignty has now waived its immunity in all proper cases. The justification for the legal fiction is gone. Now a direct action for nuisance or trespass will lie where such causes of action exist in fact.

The majority opinion invokes the legal fiction of a constitutional taking of the plaintiffs' land, not for the purpose of evading the sovereign immunity of the Port of Seattle, but to permit the maintenance of a cause of action for nuisance, which it did not find to exist.

*United States v. Causby,* 328 U. S. 256, 90 L. Ed. 1206, 66 S. Ct. 1062, is cited by the majority opinion, but it does not support it. I quote from the *Causby* case [p. 266]:

"The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. [United States constitution.] The airspace, apart from the immediate reaches above the land, is part of the public domain. . . ."

It goes on to define the public domain as the air above the minimum safe altitude of flight prescribed by the Civil Aeronautics Authority.

There are no allegations in the complaint that the flights are in violation of the rules of the Civil Aeronautics Authority. Hence, there has been no invasion of plaintiffs' property or any constitutional taking of it under the rationale of the *Causby* case.

I dissent.

[1]Reported in 348 P. (2d) 673.