191 So.2d 126 (1966)
JACKSON MUNICIPAL AIRPORT AUTHORITY and City of Jackson, Mississippi,
v.
Dr. J.W. EVANS et al.
No. 44190.
Supreme Court of Mississippi.
October 17, 1966.
Suggestion of Error Overruled November 7, 1966.
*127 E.W. Stennett, Robert E. Perry, N.W. Overstreet, Jr., Overstreet, Kuykendall, Perry & Phillips, Jackson, for appellants.
Watkins, Pyle, Edwards & Ludlam, John H. Stennis, Jackson, for appellees.
ROBERTSON, Justice.
This is an appeal from the decree of the Hinds County Chancery Court sustaining a general demurrer to the Bill of Complaint filed by the Jackson Municipal Airport Authority and the City of Jackson, Mississippi. Complainants prayed for the issuance of a preliminary injunction against the defendants requiring defendants to immediately top or remove 15 offending trees growing on defendants' land near the Jackson Municipal Airport. It was alleged that the defendants permitted these trees to grow into the restricted area, that is to say, the area more than 50 feet above the surface of defendants' land, which area had been declared within an instrument approach zone and a transition surface zone, as defined and set forth in a zoning ordinance adopted by the Joint-City of Jackson, Hinds County, Rankin County-Airport Zoning Board. The Chancellor sustained a general demurrer and dismissed the Bill of Complaint. We affirm the judgment of the lower court.
This is a case of first impression in this State. The Mississippi Legislature in 1950 passed a comprehensive act known as the "Airport Zoning Act," Mississippi Code Annotated 1942 sections 7544-01 through 17 (Recompiled 1956), which defined airport hazards, provided for the creation of a joint airport zoning board, and granted power to the joint board to adopt, administer and enforce under the police power airport zoning regulations for such airport hazard area. The Airport Zoning Act set forth in detail the procedure for adopting zoning regulations, cautioned that the regulations must be reasonable, provided for non-conforming uses, the issuance of permits and the application for and action on variances. The Act further provided for: the designation or creation of an administrative agency to administer and enforce the airport zoning regulations, the appointment of a Board of Adjustment to hear complaints and appeals from the decisions and orders of the administrative agency, and finally for judicial review.
The Act also provided for acquisition of air rights, aviation easements, or other estates or interests in land, in the following language:
"In any case in which: (1) it is desired to remove, lower, or otherwise terminate a nonconforming structure or use; or (2) the approach protection necessary cannot, because of constitutional limitations, be provided by airport zoning *128 regulations under this Act; or (3) it appears advisable that the necessary approach protection be provided by acquisition of property rights rather than by airport zoning regulations, the political subdivision within which the property or non-conforming use is located or the political subdivision owning the airport or served by it may acquire, by purchase, grant, or condemnation in the manner provided by the law under which political subdivisions are authorized to acquire real property for public purposes, such air right, aviation easement, or other estate or interest in the property or nonconforming structure or use in question as may be necessary to effectuate the purposes of this Act." Miss. Code Ann. 1942, § 7544-13 (1956).
Under the authority of this Act, the City of Jackson, Mississippi; Rankin County, Mississippi; and Hinds County, Mississippi, created a Joint Airport Zoning Board. In 1959 the said Joint Airport Zoning Board adopted a zoning ordinance containing airport zoning regulations and detailed plats illustrating the regulations, which ordinance was made an exhibit to the Bill of Complaint. The ordinance on its official plat placed the 80 acres owned by the defendants within an Instrument Approach Zone and a Transition Surface Zone as defined and set forth in the ordinance. In such zones, the Ordinance, by a complicated formula, imposes graduated height restrictions, the height of structures and trees on the defendants' land being limited to 50 feet.
The complainants, in their Bill of Complaint, charged that since 1959, the date of the adoption of the zoning ordinance, the defendants had permitted 15 trees on their land to grow and continue to grow within the restricted height elevation as provided in the zoning ordinance. The complainants further charged that the offending trees were scrub trees without any value, and that the said restricted area into which the trees protrude, was not within the reasonable and ordinary useable air space above defendants' land.
The exact footage that each tree protrudes into the restricted area is shown on a plat attached as an exhibit to the Bill of Complaint and it is not disputed that these 15 trees, being 14 oak trees and 1 hickory tree, extend into the restricted area as shown on said plat. The minimum extension is 1 foot and the maximum extension is 13 feet.
Of course, all facts well pleaded in the Bill of Complaint and exhibits thereto, are admitted by the general demurrer. Thus all facts necessary for a final determination of the case were before the lower court.
At issue is the narrow and precise question of whether the Bill of Complaint, taking all well pleaded and material facts as true, shows that the complainants under guise of a perhaps otherwise valid zoning ordinance have so interfered with and restricted the use and enjoyment of these defendants' private property as to constitute a taking or damaging thereof for public use without due compensation being first made to the owners, as required by Section 17 of The Constitution of the State of Mississippi.
The development of the common law with respect to airspace rights in the United States has been summarized as follows:
"At common law and until the development of the airplane the right of property which an owner had in the airspace above his land was recognized as absolute. Like his title to that which lay beneath his land the right was based upon the Latin maxim, `Cuius est solum, eius est usque ad coelum et ad inferos.' The early cases dealt with that part of the airspace which was directly above the land such as was occupied by projecting parts of buildings, over-hanging trees, and telephone and telegraph wires, or through which shells were fired or light beams projected.

*129 "With the development of travel by air the rights of the landowner and the rights of those traversing the air above his land came into seeming conflict. This conflict has been resolved by an adjudication which partially repudiates the ad coclum doctrine. While the owner does not in any physical manner occupy the stratum of airspace immediately above his land or make use of it in the conventional sense, he does use it in somewhat the same sense that space left between buildings for the purpose of light and air is used. The super-adjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. Invasions of such super-adjacent airspace are in the same category as invasions of the surface. (Emphasis added.)
"This doctrine is often referred to as limiting ownership to that part of the air as may be effectively possessed by the surface owner or as is necessary to the reasonable use of the surface land. It has been held also that such ownership of the super-adjacent airspace is merely a qualified ownership and that the surface owner has title only to that part of the airspace as is in his actual possession." (Emphasis added.) 2 Nichols, Eminent Domain § 5.781 (3d ed. 1963).
The offending trees are on that portion of the defendants' land which begins about 3500 feet from the south end of the main instrument runway. In the Bill of Complaint it is charged that:
"Said offending trees constitute an airport hazard in the operation of said airport, constitute a serious obstruction to aircraft landing and taking off from said airport and endangers the lives and property of users of said airport and occupants of land in said vicinity."
One of the first comprehensive cases on the use of airspace over a private owner's property by airplanes flying at low altitudes is United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). In the Causby case, the end of the airport's runway was 2220 feet from Causby's barn and 2275 feet from his home. The path of glide to this runway passed directly over his property. The 30 to 1 safe glide angle approved by the Civil Aeronautics Authority passed over this property at 83 feet, which was 67 feet above the house, 63 feet above the barn and 18 feet above the highest tree. The Causbys brought suit to recover damages for the alleged taking of their property for public use without compensation by flying military airplanes of the United States across their property at such heights as to interfere with its normal use. The U.S. Supreme Court, in discussing this case, said:
"We have said that the airspace is a public highway. Yet it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run. The principle is recognized when the law gives a remedy in case over-hanging structures are erected on adjoining land. The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. See Hinman v. Pacific Air Transport [CCA 9th] 84 F.2d 755. The fact that he does not occupy it in a physical sense  by the erection of buildings and the like  is not material. As we have said, the flight of airplanes, which skim the surface but do not touch it, is as much an appropriation of the use of the land as a more conventional entry upon it. We would not doubt that if the United States erected an elevated railway over respondents' land at the precise altitude where its planes now fly, there would be a partial taking, even though none of the supports of the structure rested on the land. The reason is that there would be an intrusion so immediate *130 and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it. While the owner does not in any physical manner occupy that stratum of airspace or make use of it in the conventional sense, he does use it in somewhat the same sense that space left between buildings for the purpose of light and air is used. The superadjacent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. We think that the landowner, as an incident to his ownership, has a claim to it and that invasions of it are in the same category as invasions of the surface. (Emphasis added.) 328 U.S. at 264-265, 66 S.Ct. at 1067, 90 L.Ed. at 1212.
Because of the decision in Causby, the Congress amended the definition of "navigable airspace" to read as follows:
"`Navigable airspace' means airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft." 72 Stat. 739 (1958), 49 U.S.C. § 1301(24) (1964).
Appellants in their brief would leave the impression that the Federal Aviation Act of 1958 "pre-empted the field" under the supremacy clause of the Federal Constitution and gave carte blanche authority to municipalities throughout the land to appropriate whatever airspace they desired to insure safety in take-off and landing.
This is not how the Supreme Court of the United States interpreted the Federal Aviation Act of 1958 in Griggs v. County of Allegheny, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), a case subsequent to the amendment of the federal act.
In Griggs, the county had designed plans for its airport, including the arrangement of its take-off approach areas, in compliance with federal requirements and under supervision of and subject to the approval of the Civil Aeronautics Administrator.
In the Griggs case, as in the case at bar, the enabling legislation had included authority to acquire air navigation easements, but none had been acquired from the plaintiff whose property was located near the end of a runway. The plaintiff in Griggs alleged that the constant and extremely low over-flights interfered with the use of his property and deprived him of property without due process of law, in violation of his rights under the Fourteenth Amendment. The Supreme Court held that the interference with plaintiff's property caused by these over-flights amounted to a taking in the constitutional sense of an air easement, for which compensation must be paid by the county.
In Griggs, the land was located 3250 feet from the end of the runway and the glide path passed 81 feet above the ground of plaintiff's property. In the case at bar, the exhibits to the Bill of Complaint show that appellees' property is approximately 3500 feet from the end of the main instrument run and that the glide slope utilized by airplanes varies from approximately 45 feet to approximately 70 feet above the surface of the land.
The Court in Griggs noted that Congress had redefined navigable airspace to include airspace needed to insure safety in take-off and landing of aircraft, but nonetheless concluded that Congress merely intended to authorize the taking of this airspace by constitutional means, and did not intend that an owner be deprived of this airspace without compensation. The Court stated:
"The glide path for the northeast runway is as necessary for the operation of the airport as is a surface right of way for operation of a bridge, or as is the land for the operation of a dam. * * * As stated by the Supreme Court of Washington in Ackerman v. Port of Seattle, 55 Wash.2d 400, 401, 413, 348 P.2d 664, 671, 77 A.L.R.2d 1344, `* * * an *131 adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed * * *.' Without the `approach areas,' an airport is indeed not operable. Respondent in designing it had to acquire some private property. Our conclusion is that by constitutional standards it did not acquire enough." 369 U.S. at 90, 82 S.Ct. at 534, 7 L.Ed. at 589.
The Federal Aviation Act of 1958 expressly provided that "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute * * *.", 49 U.S.C.A. § 1506. This makes it perfectly clear that it was not the intent of Congress to cut off common law and statutory rights of private landowners.
The case of Ackerman v. Port of Seattle, 55 Wash.2d 400, 348 P.2d 664, 77 A.L.R.2d 1344 (1960), quoted with approval by the U.S. Supreme Court in Griggs, is a modern and well reasoned case which should be given particular weight in Mississippi because Art. I, Section 16, Amendment 9 of the Washington Constitution prohibits a taking or damaging for public use, as does Section 17 of the Mississippi Constitution.
The Ackerman case was procedurally the converse of this case, in that the landowner brought an action for damages, alleging that there had been a taking of his private property for public use by the Airport Authority, and the demurrer of the Airport was sustained by the trial court. The substance of the complaint was that appellant's land lay directly in the approachway or glide path for airplanes landing or taking off from the airport and that the airport, having the power of eminent domain, had nonetheless refused to acquire the proposed use for approachways, either by purchase or by appropriate condemnation proceedings. The Washington Court held that there had been a taking in the constitutional sense and reversed the cause to determine damages.
The Court in Ackerman began its discussion of the constitutional issues as follows:
"The invention of the airplane and the development of modern air transportation (with resulting changes in human relationships) have occurred somewhat subsequently to the development of the legal concepts emphasized in formulating early common law theories of liability. An awareness of these changes makes it incumbent upon us to heed the advice of the framers of the Washington constitution when they said:
`* * * A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government.' Washington constitution, Art. I, § 32.
"One of the fundamental principles involved in this action is the ownership of private property and the right to the free use and enjoyment thereof. Another basic principle is the authority of the government (always subject to constitutional safeguards) to regulate the use and utilization of private property for the promotion of the public welfare. At times, as in the instant litigation, these principles are in conflict, and the courts are called upon to resolve the resulting problem in human and legal relationships. In doing so, the courts constantly emphasize the concepts of (1) `regulation' under the police power, and (2) `constitutional taking or damaging' under the eminent domain power. When restrictions upon the ownership of private property fall into the category of `proper exercise of the police power,' they, validly, may be imposed without payment of compensation. The difficulty arises in deciding whether a restriction is an exercise of the police power or an exercise of the eminent domain power. When private property rights are actually destroyed through the governmental action, then police power rules are usually applicable. * * * But, *132 when private property rights are taken from the individual and are conferred upon the public for public use, eminent domain principles are applicable. * *" (Emphasis added.) 348 P.2d at 668-669.
The Washington Court quoted with approval the words of Mr. Justice Holmes in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415-416, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922), as follows:
"* * * The protection of private property in the 5th Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. * * * When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.
"* * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. * * *" (Emphasis added.)
One of the latest cases, and perhaps one of the closest to the instant case, as to the facts is Indiana Toll Road Commission v. Jankovich, 244 Ind. 574, 193 N.E.2d 237 (1963), cert. denied, 379 U.S. 487, 85 S.Ct. 493, 13 L.Ed.2d 439 (1965).
In Jankovich, the City of Gary adopted an ordinance creating an airport commission and pursuant to legislative authority enacted an Airport Zoning Ordinance. This ordinance, which incorporated an Airport Zoning Map, prohibited the erection of any structure for a distance extending 6,000 feet from the end of the proposed runway to any height which would interfere with the glide angle therefrom within the inner approach zone area. The glide angle in Jankovich was 40 feet horizontally to each 1 foot of vertical height. The Jackson Airport ordinance provides for an approach zone glide angle of 50 feet horizontally to each one foot of vertical height, which is thus a lower and more restrictive glide path than that provided for in the Gary ordinance.
The Gary ordinance contained the usual recitals about public health, public safety and general welfare and the usual provisions for nonconforming uses and variances. The plaintiffs-appellees in Jankovich were the lessees and operators of the airport, and had invested large sums in the purchase of facilities.
Thereafter the appellant located and constructed its toll road, crossing the inner area approach zone at a point approximately 743 feet from the end of the proposed runway and approximately 25 feet higher than the elevation of the end of the proposed runway.
Under the ordinance the permitted elevation of structures at the location of the toll road was approximately 18 1/2 feet, the toll road thus projecting itself into the prohibited area about 6 1/2 feet. Appellees based their action for an injunction requiring reduction in elevation of the toll road, and for damages on this encroachment by appellant upon the approach zone to the airport.
The trial court found for the plaintiffs (lessees and operators of the airport). On appeal, the Indiana Supreme Court reversed the judgment of the trial court and directed a finding for the defendant (landowner). In deciding this case, the Court said:
"The fact that private property may not be taken for public use without compensation is not debatable. However, in determining whether this constitutional protection has been violated by the ordinance under consideration, two main issues arise: (1) Whether air space above land is a constitutionally protected *133 property right, and (2) whether in the instant case there has been a constitutionally proscribed taking.
"With respect to the first issue, the law has been made clear by both legislative and judicial declaration that a landowner is also the owner of the air space above his property, at least to the extent that such air space may reasonably be used by him."
"* * *"
"The next problem is whether an unconstitutional taking has resulted in the instant case. In considering this point the distinction must be made between zoning regulations which merely restrict the enjoyment and use of property through a lawful exercise of the police power, and a taking of property for a public use, for which compensation must be paid. In the former instance, where the owner of property is merely restricted in the use and enjoyment of his property, he is not entitled to compensation. A common example of such an authorized restriction is the imposition on property of building set-back lines. * * *
"However, mere regulation under the police power which can be modified at the discretion of regulating authority is wholly different from the taking or appropriating of private property by the government for a specific public use. The latter can be effected only if compensation is provided. * * *
"With this distinction established, it becomes apparent that the City of Gary has attempted, by the passage of the ordinance under consideration, to take and appropriate to its own use the ordinarily usable air space of property adjacent to the Gary Airport without the payment of compensation." 193 N.E.2d at 239, 240-242.
There are many cases from other states which support the judgment of this Court in the instant case. Some of these, involving airport zoning ordinances which impose height restrictions in approach zones, are Dutton v. Mendocino County, 1949 U.S. Av. 1 (Cal.Sup.Ct. 1948); Roark v. City of Caldwell, 87 Idaho 557, 394 P.2d 641 (1964); Bowling Green-Warren County Airport Board v. Long, 364 S.W.2d 167 (Ky. 1962); Mutual Chemical Company v. Baltimore, 1939 U.S. Av. 11 (Md.Cir.Ct. 1939); Yara Engineering Corporation v. City of Newark, 132 N.J.L. 370, 40 A.2d 559 (1945); and State ex rel. Royal v. City of Columbus, 3 Ohio St.2d 154, 209 N.E.2d 405 (1965).
Other recent cases containing principles applicable are Thornburg v. Port of Portland, 233 Or. 178, 376 P.2d 100 (1962) and Martin v. Port of Seattle, 64 Wash.2d 309, 391 P.2d 540 (1964).
The validity of the 1950 Mississippi Airport Zoning Act is not at issue. Neither is the validity of the 1959 Jackson Municipal (Rankin County) Airport Zoning Order.
We find that the Bill of Complaint shows on its face that the Complainants-Appellants under the guise of a perhaps otherwise valid zoning order have so interfered with and restricted the use and enjoyment of Defendants-Appellees' private property as to constitute a taking or damaging thereof for public use without due compensation being first made as required in Section 17 of the Constitution of the State of Mississippi.
The judgment of the lower court in sustaining a general demurrer to the Bill of Complaint and dismissing the Bill of Complaint is, therefore, affirmed.
Affirmed.
ETHRIDGE, C.J., and JONES, PATTERSON and INZER, JJ., concur.