[No. 44226.   En Banc.   November 3, 1977.]

THE DEPARTMENT OF ECOLOGY, ET AL, JAMES R. HUNTLEY and COLLEEN GROUNDS HUNTLEY, his wife, *Respondents,* v. PACESETTER CONSTRUCTION COMPANY, INC., ET AL, *Appellants.*

*Derrill T. Bastian,* for appellants.

*Slade Gorton, Attorney General, Charles B. Roe, Jr., Senior Assistant, Robert V. Jensen, Assistant, Pease, Doces & Lewicki, P.S., Arthur G. Barnett,* and *Gust S. Doces,* for respondents.

Horowitz, J.—The principal issue appellants–defendants raise is whether the Shoreline Management Act of 1971 as applied to a privately owned lakefront lot violates article 1, section 16 (amendment 9) of the state constitution which forbids the taking or damaging of private property without just compensation.

The controlling facts are these. In May 1973, Pacesetter Construction Company (Pacesetter) acting through defendant–appellant Hoffman, a member of its board of directors, purported to purchase a house and lot in Hoffman's name in a residential area of Seattle. The lot fronts on Lake Washington and extends back from the lake a substantial distance. It is located, as are the lots of neighboring property owners, in what the Shoreline Management Act of 1971 (SMA) defines as "wetlands." RCW 90.58.030(2)(f). Both to the north and to the south of Pacesetter's property are similar lots which also front on Lake Washington. The residences on these lots are uniformly located on the upper portion of the properties, conforming to a voluntarily created setback line to preserve the excellent and much valued view the owners of these lots enjoy.

In August 1973, the City of Seattle approved Pacesetter's application as owner to divide the purchased lot into two parts, the upper and lakeward lots. Two years later the City of Seattle, at Pacesetter's request, issued building permits to build a house on each lot. The lakeward house was designed to reach a height of 37.9 feet above the grade level existing when construction began and was much closer to the lake than the other houses in the neighborhood. Furthermore, the location of both houses violated Seattle's building code 5–foot sideyard setback requirement.

In August 1974, plaintiff–respondents Huntley purchased the adjoining waterfront house and lot immediately north of the Pacesetter property. The Huntleys thereafter, beginning in July 1975 and prior to commencement of construction by Pacesetter, made repeated attempts to find out about Pacesetter's proposed construction on its property, and Pacesetter falsely assured them the lakeward house

would not substantially impair the view from Huntley's property.

Pacesetter sent the City an earnest money agreement for the upper house and lot dated August 9, 1975, purportedly executed by a Mr. and Mrs. Tingwall. The agreement was written without Tingwalls' permission and their signature was forged by a Pacesetter employee. Pacesetter at the same time falsely assured the City Hoffman was a "contract purchaser" of the lakeward lots. The City relied on Pacesetter's representations and no substantial development permit was required.

From the time it had acquired its lots, Pacesetter had taken steps to avoid the otherwise existing necessity of obtaining a substantial development permit under SMA. Thus, when Pacesetter acquired property, Hoffman purported to enter into a contract with Pacesetter to have the latter build him a house on the lakeward part of the purchased lot. The trial court held this contract to be void and unenforceable and that this contract was a subterfuge by defendants to deceive the City of Seattle and to avoid the requirement of obtaining a substantial development permit required by SMA.

The plans for the lakeward house were finally revealed at an August 22, 1975, meeting in Seattle. Defendants indicated they intended to continue the construction. In November 1975, the night before Mrs. Tingwall's deposition, the Tingwalls signed a second earnest money agreement backdated to August 18, 1975. The trial court, in an unchallenged finding, found this to be an apparent attempt to manufacture evidence. Tingwalls were later released by Pacesetter from this second agreement. The court further found that the Tingwall earnest money agreement was a sham to mislead the City into continuing, in effect, a building permit on the upper portion of the Pacesetter property.

Huntleys commenced an injunction suit against defendants on September 5, 1975, alleging, *inter alia,* that no substantial development permit was applied for as required by RCW 90.58.140 and that both the upper and lakeward

houses were in violation of RCW 90.58.320 and the policies of SMA set forth in RCW 90.58.020. On September 19, 1975, the State of Washington, Department of Ecology, joined the suit as plaintiff and obtained a temporary restraining order halting construction of the houses. At that time, the foundations had been poured for both houses and two of three stories had been framed in on the lakeward house.

The court, after trial, entered a permanent injunction ordering removal of both houses, restoration of the original grade on the lakeward lot, prohibiting construction of any structure closer to the lake than the neighboring houses, and awarded Huntleys accrued and continuing damages for loss of view until abatement. The court also cancelled building permits on both houses because they were fraudulently obtained, ordered the City to require a substantial development permit prior to allowing any further construction on the property and required the City to consider whether the area around the property is environmentally sensitive under the State Environmental Policy Act of 1971 (SEPA—RCW 43.21C). The court awarded Huntleys their costs and attorneys' fees and awarded the Department of Ecology its costs. Defendants appealed, and plaintiff Huntley and the Department of Ecology cross–appealed.

The first issue defendants raise is whether SMA as applied to the two Pacesetter lots is a taking or damaging of private property without compensation. The various tests that have been applied or suggested to resolve similar questions have created much controversy. Defendants' brief describes four tests, the test most commonly applied being the so–called test of balancing private loss against public gain. *See generally* F. Michelman, *Property, Utility and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv. L. Rev. 1165, 1191 (1967); J. Kusler, *Open Space Zoning: Valid Regulation or Invalid Taking,* 57 Minn. L. Rev. 1 (1972).

Whatever may be the relative merits of the respective tests, Pacesetter concedes the trial court in holding no taking or damaging occurred under Const. art. 1, § 16 (amendment 9) balanced the private loss against public gain. Thus, in finding of fact No. 24, in referring to the defendant's proposed use of the Pacesetter property, the court finds:

> This drastic effect upon the neighborhood and the effect upon the neighbors is a much greater loss socially and generally than the loss to one owner in requiring him to restrict his use in a manner that will not cause deterioration of the present conditions of the shoreline.

Finding of fact No. 25 states:

> There is no evidence that application of the regulations of the Shoreline Management Act of 1971 to the Pacesetter property will deprive Pacesetter as an owner of all reasonable, economic use of its land.

Conclusion of Law No. 9 states:

> If one house sits far ahead of the others, then for that one person's financial benefit, he would be allowed to cause a drastic invasion into the aesthetics of the neighborhood and a tremendous financial loss to all of his neighbors.

■ The balancing test used by the trial court was adopted by this court while the instant case was on appeal. *Maple Leaf Investors, Inc. v. Department of Ecology*, 88 Wn.2d 726, 565 P.2d 1162 (1977). There the Department of Ecology denied property owners a permit to operate, maintain and construct single family homes within a flood control zone. The property owners contended they were entitled to just compensation because the denial deprived them of the use of 70 percent of their land on which to construct houses. The State contended RCW 86.16, which provides for flood control zones by the State, is police power legislation and no unconstitutional taking or damaging occurred by applying the statute. This court agreed, stating:

> The next issue raised by the appellant is whether the prohibition on construction for human habitation within the floodway is a taking or damaging of private property

for public use in violation of Const. art. 1, § 16, and the fifth amendment to the United States Constitution, or whether the prohibition is a valid exercise of the state police power.

In cases such as this, the judicial reasoning involved in a determination of the issue of police power versus condemnation is not reduced to a precise formula, nor is it capable of being so handled. There is no single, simple test to use in dealing with the taking issue. The court, guided by broad general principles, must decide each case on its own facts. *See* Bosselman, Callies & Banta, *The Taking Issue* (U.S. G.P.O. No. 4111–00017, 1973); Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria,* 44 S. Cal. L. Rev. 1 (1971).

The question essentially is one of social policy which requires the balancing of the public interest in regulating the use of private property against the interests of private landowners not to be encumbered by restrictions on the use of their property. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 67 L. Ed. 322, 43 S. Ct. 158, 28 A.L.R. 1321 (1922); *Ackerman v. Port of Seattle,* 55 Wn.2d 400, 348 P.2d 664, 77 A.L.R.2d 1344 (1960); *State v. Dexter,* 32 Wn.2d 551, 202 P.2d 906, 13 A.L.R.2d 1081 (1949).

*Maple Leaf Investors, Inc. v. Department of Ecology, supra* at 731.

The balancing test has been widely followed. *See, e.g., HFH, Ltd. v. Superior Court,* 15 Cal. 3d 508, 542 P.2d 237, 125 Cal. Rptr. 365 (1975); *Candlestick Properties, Inc. v. San Francisco Bay Conservation & Dev. Comm'n,* 11 Cal. App. 3d 557, 89 Cal. Rptr. 897 (1970); *Brecciaroli v. Connecticut Comm'r of Environmental Protection,* 168 Conn. 349, 362 A.2d 948 (1975); *Sibson v. State,* 115 N.H. 124, 336 A.2d 239 (1975); *Just v. Marinette County,* 56 Wis. 2d 7, 201 N.W.2d 761 (1972). *See generally* J. Kusler, *supra;* J. Sax, *Takings and the Police Power,* 74 Yale L.J. 36 (1964); J. Sax, *Takings, Private Property and Public Rights,* 81 Yale L.J. 149 (1971); A. Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria,* 44 S. Cal. L. Rev. 1 (1971).

Defendants contend the balancing test is unsound because it fails to distinguish between a statutory regulation constitutionally requiring compensation to be paid and a statutory regulation lawfully imposable without payment of just compensation. They rely upon F. Michelman, *supra* at 1191. This criticism, however, has not served to change the view of the majority of the courts which accept the balancing test. *HFH, Ltd. v. Superior Court, supra* at 522 explains:

> Finally, we note that our conclusion in no sense turns on the verbal distinction between "taking" and "police power." While these terms have a venerable history in discussions of this question, at best they have served as a shorthand method of indicating the result; neither hard nor easy cases are decided by such merely verbal lines. Rather, the far more basic considerations of reciprocity discussed above have shaped the decisions in this area, decisions which reconcile property rights and social needs.

(Footnote omitted.) Moreover, in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 67 L. Ed. 322, 43 S. Ct. 158, 28 A.L.R. 1321 (1922), the court notes a "[g]overnment hardly could go on if to some extent, values incident to property could not be diminished without paying for every such change in the general law." *See* A. Van Alstyne, *supra.*

Furthermore, assuming arguendo, defendants' remedy is an award for damages for just compensation rather than the invalidation of SMA (*see HFH, Ltd. v. Superior Court, supra*) the losses of which defendants complain may be overstated. The 35–foot maximum height limitation on building improvements in wetland areas so they will not "obstruct the view of a substantial number of residences on areas adjoining" (RCW 90.58.320), and the historic setback requirements in the general area of the Pacesetter lakeward lot are restrictions not only for the benefit of Pacesetter's neighbors but also for the benefit of Pacesetter itself and *its potential grantees,* serving to protect the view from

Pacesetter's property. For all the record shows, the reciprocal protection afforded Pacesetter may substantially diminish or completely offset whatever diminution in value Pacesetter might otherwise sustain by being compelled to comply with the court's decree and SMA.

Defendants further argue that if the trial court otherwise properly applied the balancing test, it is still entitled to compensation because the protection of aesthetic values is a taking or damaging under article 1, section 16 (amendment 9) of the state constitution and is not a proper subject for exercise of the police power without payment of compensation. Much decisional law upholds a government regulation protective of aesthetic values whether or not accompanied or combined with the protection of economic values. The Supreme Court of the United States has explained:

> The concept of the public welfare is broad and inclusive . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well–balanced as well as carefully patrolled . . . If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.

*Berman v. Parker,* 348 U.S. 26, 33, 99 L. Ed. 27, 75 S. Ct. 98 (1954). Similarly, in *Stone v. Maitland,* 446 F.2d 83, 89, (5th Cir. 1971), the court stated that "in an age in which the preservation of the quality of our environment has become such a national goal, a concern for aesthetics seems even more urgent." *Accord, Belle Terre v. Boraas,* 416 U.S. 1, 6, 39 L. Ed. 2d 797, 94 S. Ct. 1536 (1974).

Many cases hold protection of aesthetic values alone justify the exercise of police power without payment of compensation. *John Donnelly & Sons, Inc. v. Outdoor Advertising Bd.,* __ Mass. __, 339 N.E.2d 709, 716–19 (1975); *People v. Stover,* 12 N.Y.2d 462, 191 N.E.2d 272, 240 N.Y.S.2d 734 (1963); *Oregon City v. Hartke,* 240 Ore. 35, 49–50, 400 P.2d 255 (1965). *See generally* J.

Dukeminier, *Zoning for Aesthetic Objectives: A Reappraisal,* 20 Law & Contemp. Prob. 218 (1955). C. Rodda, *The Accomplishment of Aesthetic Purposes Under the Police Power,* 27 S. Cal. L. Rev. 149 (1954); B. Uddo, *Land Use Controls: Aesthetics, Past and Future,* 21 Loyola L. Rev. 851, 863–74 (1975); Comment, *Distinguishing Eminent Domain from Police Power and Tort,* 38 Wash. L. Rev. 607 (1963).

Moreover, the legislature has given expression to this state's public policy of supporting protection of aesthetic values by the enactment of SMA and similar statutes. *See* RCW 90.58, including RCW 90.58.020 and .320; 90.54.010 and .020(3)(a); and RCW 43.21C.020(2)(b). *See also* WAC 173–16–040(5)(c)(iii). Indeed, RCW 90.58.320 expressly provides that no substantial development permit will be issued for any structure over 35 feet high that will obstruct the view of a substantial number of residents in the area adjoining the structure.

■ We need not, in the instant case, rest our decision on the need to protect aesthetics alone. Here, the underlying findings establish that the loss of view substantially reduces the values of the shoreline properties of the Huntleys and their neighbors, thus entitling them to protection against that economic loss without payment by the State of just compensation. *Markham Advertising Co., Inc. v. State,* 73 Wn.2d 405, 421–24, 439 P.2d 248 (1968), *appeal dismissed,* 393 U.S. 316, 21 L. Ed. 2d 512, 89 S. Ct. 553 (1969), *rehearing denied,* 393 U.S. 1112, 21 L. Ed. 2d 813, 89 S. Ct. 854 (1969); *Lenci v. Seattle,* 63 Wn.2d 664, 676–77, 388 P.2d 926 (1964). *See State ex rel. Saveland Park Holding Corp. v. Wieland,* 269 Wis. 262, 271, 69 N.W.2d 217 (1955), *cert. denied,* 350 U.S. 841, 100 L. Ed. 750, 76 S. Ct. 81 (1955).

Finding of fact No. 22 states the view obstruction which would result if Pacesetter's lakeward house were completed would cause a $35,000 reduction in the value of the Huntleys' property and a substantial loss in the value of the properties of four other neighbors. Moreover, the trial

court found the partial construction of the lakeward house had already caused damages to Huntleys and their neighbors from September 19, 1975, until February 2, 1976, totalling $5,387.50. Finding of fact No. 23.

The validity of the appealed decree is further supported. First, the extensive grading, moving and filling done on the Pacesetter property in the absence of a substantial development permit is inconsistent with the fundamental policy of SMA to protect against adverse effects to shoreline land and vegetation. RCW 90.58.020. Second, the project is inconsistent with the permitted uses which favor preservation of the shoreline's natural character and the ecology of the shoreline. RCW 90.58.020. Third, neither of the partially completed houses on the Pacesetter lot conforms to section 26.16.090 of the Seattle building code, which requires a 5-foot sideyard setback. Fourth, defendants willfully violated SMA by proceeding with construction without first obtaining a substantial development permit. It is unchallenged they committed fraud to avoid complying with the permit requirement. Such fundamental violation is a threat to future effectiveness of SMA. Defendants do not contend this violation should not have been considered by the trial court in cancelling the building permits and in making its abatement order.

■ Defendants' other contentions may be briefly noticed. They contend the 35-foot building height restriction contained in RCW 90.58.030(3)(e)(vi) and .320 should be measured from the grade established after construction. We agree with the trial court, however, the height restriction must be measured from the average grade level in the natural state of the land. *See* WAC 173-14-110(11). Any other view would be in conflict with the reason for the height restriction, namely to protect the view of a substantial number of residences in wetland areas adjoining the lake. Although only partially constructed, the house on the lakeward lot substantially obstructs the view of the Huntleys and their neighbors. That view would be obstructed even more if the house, instead of being 35 feet

from average grade level in the natural state of the land, was almost 3 feet higher.

■ Defendants further contend SMA should be construed as being in pari materia with the local and state building codes because they all regulate construction. We are satisfied, however, that SMA is a state statute of general application basically intended for the protection of the environment rather than the quality of construction, and, that, to the extent of any conflict between the Seattle building code and SMA, the latter must govern. Const. art. 11, § 11; RCW 90.58.140(3); RCW 90.58.280.

■ Defendants also complain of the decree provision ordering the City to consider whether the area surrounding the Pacesetter property is environmentally sensitive under SEPA guidelines (WAC 197–10–177) before it issues any further building permits for residential structures on the Pacesetter property. The City is merely ordered to perform its statutory duty. RCW 90.58.050; RCW 43.21C.030, .040. The City's brief states the City intends to perform what the decree requires whether or not it is ordered so to do by the decree. The City has not appealed. Even if error occurred defendants would not be aggrieved by these appealed decree provisions. ROA I–14; *Terrill v. Tacoma,* 195 Wash. 275, 80 P.2d 858 (1938).

It remains to consider the cross appeal. The Huntleys contend the trial court, in addition to decreeing costs in their favor, should also have entered judgment in favor of their neighbors for the amounts found by the trial court to be their respective damages. Findings of fact Nos. 22, 23. Plaintiffs rely upon RCW 90.58.230, which provides that "[p]rivate persons shall have the right to bring suit . . . on their own behalf and on the behalf of all persons similarly situated." Plaintiffs also rely on SMA's rule of liberal construction under RCW 90.58.900 as supporting their contention that CR 23 has no application here.

■ RCW 90.58.230 does not indicate any intention to deprive litigants to which the statute applies of the protections afforded class actions under CR 23. That rule, as in

Fed. R. Civ. P. 23 "provides a means by which, where a large group of persons are interested in a matter, one or more may sue or be sued as representatives of the class without needing to join every member of the class." C. Wright, *Law of Federal Courts* § 72, at 306 (1970).

Under CR 23(a) the plaintiffs may sue on behalf of the class of which he is a member only if they meet four requirements. These include the requirement that "the class is so numerous that joinder of all members is impracticable" and, under CR 23(b), only if additional requirements are also met. The court "as soon as practicable" must determine by order whether it is to be so maintained. The court under CR 23(d) is also empowered to enter further orders as to the conduct of the class action. These include orders concerning the giving of notice to members of the class and the giving to members of the class an opportunity to object or to intervene in the action. Moreover, CR 23(e) requires court approval of dismissal or compromise of action after due notice of all members of the class in such manner as the court directs.

The protections of CR 23 to all members of the class, as described above, are very substantial. We do not believe RCW 90.58.230 was intended to supersede the class action rule and render unavailable the protections afforded by CR 23. To hold otherwise would provide no guidance to persons suing under RCW 90.58.230 on matters covered by CR 23 including the necessity of affording an opportunity to a property owner similarly situated to refuse to join the action, or, if willing to join, to intervene as of right through his own counsel. Nothing in RCW 90.58.230 suggests its purpose and intention was to deprive a property owner similarly situated of the benefits of CR 23. The most that RCW 90.58.230, dealing with the matter of bringing representation actions, can be fairly said to accomplish is, to provide a hospitable reception and encouragement for their maintenance, control and disposition in SMA litigation. The trial court correctly refused to enter judgments in

favor of the nonappearing neighbors and correctly limited the award of damages and other relief to the plaintiffs.

The Huntleys, by way of cross appeal, also seek attorneys' fees and costs under RCW 90.58.230 for services rendered on this appeal in addition to their costs and attorneys' fees allowed by the trial court. We treat this request contained in their cross appeal as an original application to this court, on which the trial court was not required to rule in order to permit this court to make an award for such fees and costs. We believe the request should be granted by remand to the trial court to award the Huntleys their costs and attorney fees on appeal based on a proper showing of legal services rendered. *See State v. Kodama,* 4 Wn. App. 676, 680, 483 P.2d 857 (1971), analogically relevant, which dealt with attorney fees on appeal in a condemnation action in which costs and attorney fees were awarded by the trial court for legal services. The court said:

> Both are forced upon the condemnee by the action of the state in seeking to take private property, both are essential to success, and both diminish the award.

The decree is affirmed subject to remand for determination of costs and reasonable attorneys' fees on appeal.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, and DOLLIVER, JJ., concur.

WRIGHT, C.J. (concurring)—I concur in the majority opinion and have signed the same. The balancing test (*i.e.,* "the balancing of the public interest in regulating the use of private property against the interests of private landowners not to be encumbered by restrictions on the use of their property.") is applicable and valid in this case. I do want, however, to make it absolutely clear that the balancing test does have limits. There is, and must be, a point beyond which the interference with the rights of property ownership may not constitutionally go without just compensation regardless of the public interest. As we said in *Maple Leaf*

*Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 731, 565 P.2d 1162 (1977), "There is no single, simple test to use in dealing with the taking issue. The court, guided by broad general principles, must decide each case on its own facts." (Citations omitted.)

HICKS, J., concurs with WRIGHT, C.J.

HICKS, J. (concurring)—I concur in the result reached by the majority and I have signed the concurring opinion of Wright, C.J.

To that portion of the majority opinion indicating that the police power of the State may be used to regulate property *solely* for aesthetic reasons, I disagree. I am not ready to go that far at this time.