Georgianna Hill STONE, Plaintiff-
Appellee,

v.

CITY OF MAITLAND, Defendant-
Appellant.

No. 30474.

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1971.

James O. Driscoll, Driscoll & Baugh, Orlando, Fla., for defendant-appellant.

L. W. Carroll, Jr., Kenneth R. Marchman of Hunter, Pattillo & Carroll, Winter Park, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and PHILLIPS * and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Once again this Court must face ecology, Zabel v. Tabb, 5 Cir., 1970, 430 F.2d 199, cert. denied, 1971, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808. This time it is not the air to breathe or the water to drink or the maintenance of some of God's smaller creatures. Here it is primarily what one is to see. That this too is the by-product of our industrial mobile complex is the fact that the thing sought to be built is another corner gasoline filling station to serve the insatiable demands of a major marketer. What was sought was obtained, and obtained in the name no less than the Fourteenth Amendment and the Due Process Clause. Disclaiming any purpose, power or prescience in the high name of the Constitution to substitute ourselves for the legislative bodies having statutory responsibility, to second guess their judgments on matters as intricate as urban life, or to draw lines which distinguish between what men smell and see, we commit the problem—save in the most rare instances —to Florida and its courts, recognizing judicially, as do we, E. B. Elliott Advertising Co. v. Metropolitan Dade County, 5 Cir., 1970, 425 F.2d 1141, that aesthetics is one of man's protectible interests. We accordingly reverse the injunction granted to Stone, the voice of Esau, for the benefit of Shell Oil Company, the hand of Jacob.

We are called upon here to examine the constitutional validity of municipal ordinances which operate to forbid the building of a filling station on Stone's property. The District Court found that the ordinances were violative of the Due Process and the Equal Protection Clauses of the Fourteenth Amendment and granted injunctive relief against their enforcement.

In 1936 Mr. Stone, the plaintiff's husband, acquired a corner lot in Commercial District C–1 of Maitland, a suburb of Orlando, Florida. The lot has a frontage on U. S. Highway 17–92 and on Horatio Avenue.[1] Prior to Mr. Stone's death in 1964 the property had been used as a retail citrus outlet. In 1965 Mrs. Stone sought permission from the Planning and Zoning Commission of Maitland to erect the gas station on the premises since this was the property use that would accrue Mrs. Stone the greatest financial benefit.[2] In 1965 and also in 1966, Mrs. Stone's requests were rejected because her property did not meet the standards of the then extant zoning laws prescribing solely a distance limitation.[3] Then in May 1967 the City

* Of the Tenth Circuit, sitting by designation.

1. The frontage on 17–92 is 192.20 feet, on Horatio Avenue 134.68 feet.

2. At the time of trial the value of the property for use as a service station was $135,000 whereas its value for any other use would not exceed $75,000.

3. At that time the pertinent ordinance stated:
    "Section 1. No gasoline station or filling station or service station shall be erected within three hundred and fifty (350) yards of any church, hospital, school or any other such type of public assembly building used by large numbers of people and within three hundred and fifty (350) yards of an existing filling station or service station or gasoline station. The method of measurement that shall apply shall be the air line distance measured from the nearest boundary of the premises upon which there exists such churches, hospitals, schools, or other

revoked all prior zoning ordinances and adopted a new comprehensive one which in addition to the distance limitation prescribed a minimum frontage (150 feet) for interior lots and a dual frontage (150 feet) for corner lots. It is this ordinance that is here under constitutional attack.[4]

In October 1967 Stone filed for a variance with the Zoning Board of Adjustment. The Board denied the request.[5] This litigation followed.

## I. Res Judicata

At the outset we can dispose of the contention that a state court disposition of this case bars it from our consideration under the doctrine of *res judicata* or prior election of state court remedies. After the unfavorable decision of the Zoning Board, Mrs. Stone filed a writ of certiorari to the Circuit Court of the Ninth Judicial Circuit of Florida to review her case.[6] Apparently before

types of public assembly buildings or filling stations or service stations."
Zoning, Code of Ordinances, City of Maitland, Florida § 6–7 (enacted March 24, 1961).

4. "(11) Filling stations. The following regulations shall apply to the location, design, construction, operation, and maintenance of filling stations:
(a) A service station lot shall be of adequate width and depth to meet all setback requirements, but in no case shall a corner lot have less than one hundred fifty feet (150') of frontage on each streetside, and an interior lot shall have a minimum width of at least one hundred fifty feet (150').
(b) There shall be a minimum airline distance of three hundred and fifty (350) yards, measured from the nearest points of lot boundaries, between a proposed filling station and any existing filling station or between a proposed filling station and any lot occupied by a church, hospital, public or private school, public library, stadium, arena, or other place of public assembly. This provision shall not be construed to place in nonconforming status those filling stations in existence as of the date of enactment of this zoning code."
Zoning, Code of Ordinances, City of Maitland, Florida § 16–6 (enacted May 1967).

5. The District Court found that the "reason for the denial was because of the size of the property and the failure to meet the distance limitations set forth in the ordinances." It is clear that the lot does not meet the 150 foot frontage requirement of Section 16–6(11) (a), note 4, *supra*. We are unable to find in the record however exactly how the property fails to meet the distance requirements of Section 16–6(11) (b). But in view of the arguments successfully advanced and the strong attack on the dis-

tance limitation by Stone, we take it that this 350 yard standard has likewise not been satisfied. If it was record certain that the failure to comply with each section by itself, that is (i) the 150 foot requirement and (ii) the 350 yard requirement was the reason for refusal, then we would need only to find either (i) or (ii) constitutional to uphold the decision not to permit the erection of the station and would have no need to consider the constitutionality of the other. Because of this apparent, although most likely unreal, ambiguity, we think it good administration to examine the constitutionality of both (i) and (ii).

6. Section 16–10, (page 168.29–30) of the City's Zoning Code provides:
"Any person or persons, or any board, taxpayer, department, board, or bureau of the city jointly or severally aggrieved by any decision of the board of adjustment may present to the circuit court for Orange County a petition for a writ of certiorari to review a decision of the board of adjustment. The procedure shall be as set out in Chapter 176.16–21, Florida Statutes, and other applicable laws of the State of Florida. (Ord.No. 303, § 1, 5–22–67)"
The referenced sections of the above cited Florida Statutes provide:
"Any person or persons, jointly or severally, aggrieved by any decision of the board of adjustment, or any taxpayer, or any officer, department, board or bureau of the governing body of said municipality, may present to a circuit court a petition for issuance of a writ of certiorari, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality in the manner and within the time provided by the Florida appellate rules.

Upon the presentation of such petition the court may allow a writ of certiorari directed to the board of adjustment to review such decision of the board of

that Court could rule, it required that there be filed a written order or decision of the Board. Mrs. Stone's counsel twice sought such a document, but one was never supplied by the Board. Accordingly, the Circuit Court dismissed the petition.

"Under the doctrine of *res judicata* a prior judgment on the merits rendered by a state court of competent jurisdiction operates as a bar to a subsequent adjudication of the *same* cause of action, in substance rather than form, between the *same* parties or their privies in federal court * * *" (emphasis in the original). E. B. Elliott Advertising Co. v. Metropolitan Dade County, 5 Cir., 1970, 425 F.2d 1141, 1148.

█ It is obvious that in no sense did the Circuit Court render a judgment on the merits. Rather it dismissed the case on a procedural flaw, one which Mrs. Stone did all that she could to remedy. And since there has been no adjudication on the merits by the Circuit Court, there is thus no bar of *res judicata* or election of remedies.

## II. The Due Process Clause

The notion "that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic belief for the judgment of legislative bodies, who are elected to pass laws." Ferguson v. Skrupa, 1963, 372 U.S. 726, 730, 83 S.Ct 1028, 1031, 10 L.Ed.2d 93, 97.[7]

It has now been a generation since the Supreme Court's due process scythe

adjustment and shall prescribe therein the time within which a return thereto must be made and served upon the relator's attorney, which shall not be less than ten days and may be extended by the court. The allowance of the writ shall not stay proceedings upon the decision appealed from, but the court may, on application, on notice to the board and on due cause shown, grant a restraining order.

The board of adjustment shall not be required to return the original papers acted upon by it, but it shall be sufficient to return certified or sworn copies thereof or of such portions thereof as may be called for by such writ. The return shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from and shall be verified.

If, upon the hearing, it shall appear to the court that the testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse or affirm, wholly or partly, or may modify the decision brought up for review.

Costs shall not be allowed against the board unless it shall appear to the court that it acted with gross negligence, or in bad faith, or with malice in making the decision appealed from.

All issues in any proceeding under §§ 176.14–176.20, shall have preference over all other civil actions and proceedings."

7. "There is nothing covert or conflicting in the recent judgments of the Court on social legislation and on legislative repressions of civil rights. The presumption of validity which attaches in general to legislative acts is frankly reversed in the case of interferences with free speech and free assembly, and for a perfectly cogent reason. Ordinarily, legislation whose basis in economic wisdom is uncertain can be redressed by the processes of the ballot box or the pressures of opinion. But when the channels or opinion and of peaceful persuasion are corrupted or clogged, these political correctives can no longer be relied on, and the democratic system is threatened at its most vital point. In that event the Court, by intervening, restores the processes of democratic government; it does not disrupt them."

Robert Jackson, The Struggle for Judicial Supremacy at 284–85 (1940).

cut down all national efforts towards economic recovery and endangered the role of the judiciary as a co-equal branch of government. But, oddly enough, ten years before the great Court battle of the thirties, the same Court that produced the now famous constitutional anomaly of Adkins v. Children's Hospital, 1923, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 pondered the constitutionality of a local zoning ordinance and wrote an opinion in language far more reminiscent of *Ferguson* than of *Adkins*. It "must be said before the [zoning] ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." City of Euclid v. Ambler Realty Co., 1926, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303, 314.

■ Upholding the zoning code over claims that it violated the due process and equal protection clauses, the Court illustrated how such ordinances have a clear relationship to a city's efforts to protect the health and security of children, to suppress disorder, to extinguish fires, to regulate street traffic, to prevent congestion, to reduce the "danger of contagion," to facilitate police protection, to lessen the noise level and to provide a wholesome residential atmosphere to its citizens. See also Gorieb v. Fox, 1927, 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228; Nectow v. City of Cambridge, 1928, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842; Washington ex rel. Seattle Title Trust Co. v. Roberge, 1928, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210; Berman v. Parker, 1954, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27. Thus in testing the zoning ordinances before us here the sole question is whether there is a rational relationship between the ordinance and the promotion of some aspect of the City's police power—a label

which describes the full range of legitimate public interests. Mayhue v. City of Plantation, Florida, 5 Cir., 1967, 375 F.2d 447, 449.

### III. The 150 Foot Requirement

We first consider the constitutionality of the 150 foot frontage requirement. Stone claims that it is unconstitutional because (i) it discriminates against corner lot owners in that they must have 150 feet on each of two street sides and in favor of interior lot owners who only need 150 feet on one side and (ii) even though (i) demonstrates "a reasonable relation to permissible objectives which promote the public health, safety, morals and general welfare so as to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment," [8] *Elliott, supra,* 425 F.2d at 1151, the requirement violates the Equal Protection Clause because there is no similar footage requirement for other businesses such as drive-in groceries and restaurants which generate as much, if not more, drive-in-drive-through traffic than does a filling station.

■ Contention (i) we can easily deal with. The evidence showed that the heavy tourist trade in the area made trucks, U-hauls and housetrailers common sights and afforded a reasonable basis for concluding that this frontage was a necessity. Quite often several of these long vehicles would be parked end-to-end in a station. Combine this with the driving maneuvers created by gas pumps and service islands and we can only conclude that the City of Maitland, like many other cities in the vicinity, was justified in finding that this long frontage requirement was a necessity to keep the traffic flowing on the access streets. And if this traffic would otherwise accumulate on one access street it would do likewise on two. Thus a rea-

8. We believe this approach is the same as Florida's use of the "fairly debatable" doctrine in analyzing this issue. See, e. g., City of Boca Raton v. Tradewind Hills, Inc., Fla.App., 1968, 216 So.2d 460; City of Miami Beach v. Lachman, Fla., 1953, 71 So.2d 148. The term "fairly debatable" in fact first appeared in the *City of Euclid* case.

sonable relationship to the constitutionally permissible objective of reducing traffic congestion is present. In fact the District Court did not really hold that the corner lot-interior lot distinction could not be legitimately explained. Rather that Court based its holding on equal protection grounds espoused by Stone in contention (ii)—that is, other businesses with corner lots created similar traffic problems, but they had no 150 footage requirement for every side facing the street.

It is important to recognize exactly what the Equal Protection Clause entails. If the legislature senses an evil, it may deal with it. At the same time it is under no compulsion to deal with all other evils that are seen to be equally serious.

> "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. * * * Or the reform may take one step at the time, addressing itself to the phase of the problem which seems most acute to the legislative mind. * * * The legislature may select one phase of one field and apply a remedy there, neglecting the others. * * * The prohibition of the Equal Protection Clause goes no further than the invidious discrimination."

Williamson v. Lee Optical Company of Oklahoma, 1955, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573.

In *Mayhue, supra,* we invalidated a restriction that imposed a more stringent burden on those who sold liquor for consumption off the premises than those who sold it for consumption on the premises. The supposed state interest was the promotion of tourism and the preservation of order, but on all the facts the legislative body could have considered we found that the additional restrictions bore absolutely no relationship to the forwarding of these aims. So in a sense equal protection and due process are not different concepts at all in that they both center around the discovery of a rational relationship between the specific non-universal restriction and additional benefit to a public interest.

Yet once that relationship is established, the Equal Protection Clause does not impose upon the state the duty to "correct all similar evils wherever they may exist in the County or none at all." *Elliott, supra,* 425 F.2d at 1155. Because drive-in restaurants may create traffic problems, the city is not necessarily required to use the same, or even any, remedy on the traffic problems involved.

■ We have found that the frontage requirement bears a rational relationship to traffic safety at a gas station, and we therefore need not consider if a similar law would be equally effective in dealing with the problems of a drive-in grocery or restaurant. This is a problem for the legislature alone to resolve. Hence § 16–6(11) (a) does not fall under either the Due Process or the Equal Protection Clause.

### IV. The 350 Yard Requirement

We next come to the 350 yard distance requirement of § 16–6(11) (b). The District Court ruled this section invalid for two basic reasons. First, there is no inverse distance requirement forbidding the building of churches, schools, hospitals and other places of public assembly within 350 yards of a gas station.[9] Second, the Court noted that others in Maitland had been granted variances to erect gas stations even though their property failed to meet all of the ordinance requirements. The Court found that pub-

---

9. This was pure theory. There is no evidence that any such buildings had been built or that sites for them were likely to be selected within the minimum distance. Such restrictions are common in the beer-alcohol spirits area and few if any prohibit—if they could under the First Amendment—the building of a church to help men's spirits.

lic safety was the only possible justification for the exercise of the City's police power and relying on City of Miami v. Woolin, 5 Cir., 1968, 387 F.2d 893, decided that the 350 yard restriction bore no rational relationship to the promotion of public safety. Since deviations were granted and since places of public assembly could be built without restriction near the presently existing gas station, safety would be the same with or without the ordinance; therefore, it was unconstitutional.

If public safety were the sole aim of this law, *Woolin* might have more significance. But we find the city had other ends as well as safety in mind when it adopted the ordinance. Since a rational relationship to these goals is clearly present, we find it unnecessary to delve further into the safety correlation question.[10]

The record without substantial contradiction is very impressive from the City's standpoint. A prime motivation in passing a new ordinance was the desire to avoid putting too many gas stations in one area. By observing the experience of other nearby cities, Maitland officials became painfully aware of the dangers brought about by not having spacing restrictions. Absent these requirements, the probability of business failure in this highly competitive area is high. The result is abandoned stations.[11]

The abandoned station sites, which in most instances cannot be used for any other commercial purpose, become magnets for junk cars and sometimes havens for mice, rats and insects.[12] If there are several stations of this kind in one area, which there are likely to be in a commercial district, the neighborhood soon becomes a blighted eyesore and one greatly diminished in aesthetic and commercial appeal.

This Court and those in Florida have recognized that the enhancement of the aesthetic appeal of a community is a proper exercise of police power. *Elliott, supra;* City of Miami Beach v. Ocean & Inland Co., 1941, 147 Fla. 480, 3 So.2d 364; Merritt v. Peters, Fla., 1953, 65 So.2d 861; Sunad, Inc. v. City of Sarasota, Fla., 1960, 122 So.2d 611. For the value of scenic surroundings to tourists, prospective residents and commercial development cannot be overstated. But in an age in which the preservation of the quality of our environment has become such a national goal, a concern for aesthetics seems even more urgent. Cf. Zabel v. Tabb, *supra*; Note, 12 B.C.Ind. & Com.L.Rev. 674 (1971). Abandoned gas stations substantially detract from that environment, and the City was warranted in finding

10. In finding this relationship we give little weight to the finding that the city had granted five variances to build stations in District C–1, stations which did not meet the distance requirements. These variances were granted under the old, less comprehensive 1961 zoning law, see note 3, *supra*, well before Mrs. Stone's application arrived on the scene. Under the new ordinance no variances have been permitted. In *Woolin*, on the contrary, we found the variances to be the rule and not the exception. Practically every gas station was within the prohibited distance of another gas station and nearly one-third were in the prohibited distance of a church, hospital, or school. Furthermore, variances had been granted, almost without exception, before and during the pendency of the landowner's request. These numerous violations that were condoned by the city demonstrated that the city was not really trying to promote public safety by this ordinance and therefore it could not be constitutionally justified. Here, however, the record shows that the city, despite a few long-ago deviations under different ordinance guidelines, means to abide by its ordinance. This factor, therefore, does not move us even a single nudge in the direction of *Woolin*.

11. For example the City introduced the evidence of 54 abandoned gas stations in the Orlando area alone.

12. They can be, and in Florida have been, a place where crime is furthered. See United States v. Kilgen, 5 Cir., 1970, 431 F.2d 627, on rehearing, 5 Cir., 1971, 445 F.2d 287. And gas stations can produce even more bizarre risks. See Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152.

that the spacing requirements tend to reduce that threat. Thus the 350 yard distance requirement is constitutional.

We hold that it was for the City Fathers, not the Founding Fathers, to make the judgments on what Maitland needed to meet the urban menace of blight. Their judgment is confirmed, and that of the Court below reversed.

Reversed.